DAN YEARIAN, Plaintiff-Appellee, *v.* COLUMBIA NATIONAL BANK, Defendant-Appellant.

Fifth District   No. 79-390

Opinion filed July 18, 1980.

Stephen C. Buser, of Zimmer & Frierdich, of Columbia, and David R. Jones, law student, for appellant.

Thomas A. LeChien, of LeChien & Creason, Ltd., of Belleville, and William DeMyer, law student, for appellee.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

In the small claims division of the circuit court of St. Clair County, plaintiff, Dan Yearian, brought an action alleging that defendant, Columbia National Bank, had committed a trespass upon his personal property and thereby caused $252.70 of actual damage. Plaintiff also sought punitive damages in the amount of $747.30. The cause of action arose out of an attempt by defendant's agents to take possession of a motor vehicle which resembled plaintiff's and served as security for a loan defendant had advanced not to plaintiff but to one of defendant's customers, Don Polichek. Plaintiff claimed actual damage had occurred to the fiberglass molding around one of the two latches of the gate that provides access to the vehicle from the rear. The trial court found plaintiff's "[v]ehicle damaged due to defendant by its agents by trespass in willful and wanton disregard for the property rights of Plaintiff" and assessed against defendant $55.50 in compensatory and $747.30 in punitive damage and costs. From that order defendant appeals, raising three issues: (1) whether the award of compensatory damages is contrary to the manifest weight of the evidence; (2) whether photographic evidence was improperly admitted upon an insufficient foundation; (3) whether the award of punitive damages was erroneous.

At the hearing plaintiff called as one of his witnesses defendant's agent and president, Louis Schlafly, who testified that the account of defendant's customer, Don Polichek, had been delinquent, that the account had been secured by a black 1976 GMC "Jimmy," and that he had gone to the place of Polichek's employment on May 18, 1978, in order to "repossess" this vehicle. Polichek, like plaintiff, was employed by the Amax Zinc Company. While Schlafly, together with Shirley Klein, another of defendant's employees, was looking for Polichek's vehicle in the Amax parking lot, he saw Clarence Leyton, who was not only one of defendant's shareholders but also, like Polichek and plaintiff, an employee of the Amax Zinc Company. Schlafly asked Leyton if Don Polichek was at work that day. Presumably Leyton indicated that he was. Thereafter Schlafly in his search of the parking lot noticed plaintiff's vehicle, a black 1972 GMC "Jimmy," the only vehicle in the parking lot that looked like the one Schlafly sought. A GMC "Jimmy" is a four-wheel drive vehicle equipped with large tires and designed so that its body sits rather high off the ground. Schlafly testified that he had seen Polichek's vehicle on "[m]ore

than one" occasion before this incident though he did not know exactly how many times. He indicated that he had not attempted to obtain the license number of Polichek's vehicle and said that he "didn't pay attention to the license plate number" of plaintiff's vehicle.

Using keys that fit the Polichek vehicle, Schlafly tried unsuccessfully to open first the door on the driver's side and then the door on the passenger's side of plaintiff's vehicle. After lifting the hood, Schlafly entered the vehicle through the "rear lift gate," opened by pulling it away from the vehicle and lifting it up. Schlafly testified that the gate was unlocked at the time he attempted to enter the vehicle and that he had had merely to turn the handle and pull the gate up to get in. Schlafly said that once inside, he found that the ignition key did not work. Then, opening a book lying "on the passenger's side," he discovered, written inside, the name, "Dan Yearian." With that discovery, Schlafly removed himself from the vehicle through the rear lift gate and asked Clarence Leyton, who had been standing nearby chatting with Shirley Klein, whether Dan Yearian worked there. An affirmative answer to that question confirmed Schlafly's deduction that the vehicle belonged not to Polichek but to Yearian.

Schlafly testified that he and Shirley Klein had then closed the rear lift gate. He stated that at first he had tried to close the gate himself but had been unable to "get it to move." After a second unsuccessful effort to close the gate alone—one in which he "tried the latch"—he called Shirley Klein to help him. Together they were able to push the gate down, each one manipulating a latch. Schlafly denied exerting any force when he closed the gate and stated that at no time did he notice any damage to it. He had observed, he said, that the "bars on the lid" were rusted and difficult to move and that the vehicle was in "generally rough condition."

Shirley Klein testified for defendant that when Schlafly got out of the vehicle, "he had the back up, and we couldn't close it. It had a little latch on each side and then we pushed the latches and it closed." She said that she had heard no "cracking or popping sounds" when the gate was closed and that there had been no reason to force the gate open because it was not locked. She had noticed nothing in particular about the latches other than their being unlocked. Of the vehicle itself she noticed "the whole vehicle was in not too good of condition." She indicated that the failure of the duplicate keys for Polichek's vehicle to open plaintiff's did not alert them to their mistake because Polichek "had been notified that we were going to repossess the vehicle" and could have had the locks changed.

Clarence Leyton testified for defendant that on the day in question, after unexpectedly meeting Mr. Schlafly and Mrs. Klein in the Amax parking lot, Schlafly had asked him if he knew "where Don Polichek keeps his vehicle." Leyton answered that he didn't even know what

Polichek's vehicle looked like. Then, apparently referring to plaintiff's vehicle, Schlafly said, "This fits the description of the vehicle." To that Leyton responded that he did not know whether it was Polichek's or not. The witness stated that after trying unsuccessfully to open the doors of the vehicle, Schlafly "climbed in the vehicle [through the rear lift gate], went in the front seat, and immediately come [sic] out, and said, 'Dutch [Clarence], do you know anybody by the name of Dan Yearian?' And I said 'Yeah, he works here. He's a mechanic over in the truck shop.' He said, 'Well this must be his vehicle.' And I said, 'Yes, I guess it is.' That was basically the whole incident." The witness continued, "Then Mr. Hutch [Schlafly] lowered the—that—whatever you call that thing—the back window, and it wouldn't latch properly or something so he called Mrs. Klein over and they both—it just went together, real easy." Asked, "What, if any, sound did you hear when Mr. Schlafly and Mrs. Klein were closing the back gate of that truck?" the witness answered,

"None. They didn't have that much trouble. It was—one side apparently wouldn't—I can't say apparently, I suppose—but when he shut it, obviously he was having trouble getting it to close so he called Mrs. Klein over and she was standing on one side and he was on the other side and it just closed and that's it."

Two Amax employees, Vernon Chilton and Revis Watson, testified for plaintiff. Chilton said that on the day in question he had been in a "shack" about 100 feet from plaintiff's vehicle when he saw a man and woman drive up in a car. His account of the conduct of the man, whom he identified in the courtroom as Schlafly, corroborated that of Schlafly. However, the witness said he did not see how many times Schlafly attempted to close the gate, and his other testimony with respect to Schlafly's closing of the gate is not helpful because of portions transcribed as "inaudible." Watson said that on that day he saw "Dutch" [Clarence] Leyton talking to "this man and woman." The witness stated that then he talked to Elmer [Vernon Chilton] who "was explaining what happened. As far as seeing it, I never seen it really."

Plaintiff testified that on the day in question an employee notified him that someone was in his "truck," which was apparently visible from the place where that employee worked. However, by the time plaintiff and a guard reached his vehicle, no one was there. He noticed that both the hood and the rear gate were incompletely latched. Finding both doors locked and fearing theft of his spare tire, which cost over $150, or his tools, stereo or battery, he entered the vehicle through the rear lift gate and inspected for any loss. Finding none, he apparently resumed work. Later, as he drove from the parking lot, he heard the gate rattling, assumed he had not closed it securely, stopped to inspect and discovered cracks in the fiberglass molding near one of the latches. He indicated that

the damage was not readily visible with the gate partially latched and for that reason, together with his preoccupation with the possibility of theft during his initial inspection, he had not noticed the damage earlier. He testified that in order to lock the gate, one had to turn the latches down manually. He speculated that if the latches were not so turned, the fiberglass would break because of the weight of the gate, "close to one hundred pounds if not better." He gave as the reason for the need to turn the latches by hand the age of his vehicle—it was seven years old at the time of the hearing: "I just assume that is from wear and tear on it that you have to turn it." He testified that prior to the entry by Schlafly the gate was not damaged.

Plaintiff claimed that as a result of the damage the gate required replacement rather than repair. However, the trial court expressly found that though plaintiff had shown that replacement of the gate had been recommended, plaintiff had put on no evidence of the basis of the recommendation for replacement or the cost of repair. Making certain findings with respect to costs for repair, the trial court ordered that defendant pay compensatory damages accordingly, in an amount substantially less than that plaintiff had asked.

Defendant contends on appeal that the trial court's award of compensatory damages requires reversal because such an award is contrary to the manifest weight of the evidence. We disagree. Despite the testimony of Schlafly that he had observed no damage to the vehicle and had exerted no force on the gate when he closed it, he admitted that he had had difficulty closing it, difficulty observed by two other persons including defendant's other agent present, Shirley Klein, who came to his assistance at his request because of it. Furthermore, plaintiff testified that because of the age of the vehicle, manipulation of the latches in a certain way was required in order to close the gate. He spoke, too, of the not-inconsiderable weight of the gate. Schlafly and Shirley Klein both testified that they closed the gate by manipulating the latches. Whether they did so in the way described by plaintiff is not known. Plaintiff testified that he had found the gate partially latched and that the damage had not existed prior to this episode. He indicated as well that the damage, having occurred on the side of the panel, was not particularly visible when the gate was partially latched. If the damage was not particularly visible to plaintiff for that reason, it would have been not particularly visible to Louis Schlafly or Shirley Klein for the same reason. There is no evidence that they reopened the gate after finally getting it closed. Without doing so, they might well not have seen any damage they might have caused. Since they did not think they had caused any damage, they would have had little reason to look for evidence thereof. Therefore, we think that the trier of fact could reasonably have found that defendant's agents had

damaged the rear lift gate of plaintiff's vehicle. Here the trial court was asked to believe one of two inconsistent accounts of the episode, one in which defendant's agents damaged plaintiff's vehicle and another in which they did not. Since the trial court is in a better position to assess the credibility of the witnesses than is the reviewing court, we do not disturb its finding unless it is against the manifest weight of the evidence. (*Bridges v. Neighbors* (1975), 32 Ill. App. 3d 704, 336 N.E.2d 233.) Since the trial court's finding that defendant by its agents damaged plaintiff's vehicle is not contrary to the manifest weight of the evidence, we will not disturb it.

Defendant contends that the trial court erred in denying its objection to the admission of certain photographic evidence upon the ground of insufficient foundation. Defendant maintains that "[w]hile it was established that Yearian took the photographs approximately three to five days after the incident occurred, there is no basis upon which it can be determined whether the damage occurred after the incident took place and before the pictures were taken. Furthermore, since it was indicated that the rear lift-gate was partially rusted and that the vehicle itself was in a generally rough condition, the specific condition of the gate prior to this incident should have been established in order to determine whether the damage portrayed in the picture could have occurred prior to the incident in question." Plaintiff testified that the photograph in question showed the "entire damage" to his vehicle. He identified in the photograph the precise area of damage. Asked, "And does it [the photograph] accurately reflect the damage that was done to the lower right hand corner of the access to your vehicle?" he answered, "I think it's very accurate." Earlier he had described how on May 18, 1978, he had learned of Schlafly's entry into his vehicle and had later noticed "the damage" to the rear lift gate. Therefore, by his testimony, plaintiff had already established that the damage portrayed had occurred on May 18, 1978. Thus, any inference that this damage occurred either sometime prior to that date or sometime after it, though prior to the taking of the photograph, defies logic and reason. Likewise, any attack upon the validity of the instant judgment which relies upon such an inference is altogether meritless.

■■ Defendant's final contention goes to the propriety of the award for punitive damages. Not long ago in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359, the supreme court stated plainly the rule that the question of whether the facts of a case warrant the imposition of punitive damages is one not of fact but of law:

> "It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others (*Consolidated*

*Coal Co. v. Haenni* (1893), 146 Ill. 614). Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future. (*Eshelman v. Rawalt* (1921), 298 Ill. 192, 197.) And, while the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law. *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 87."

Thus the question for the reviewing court is not whether a finding of wilful and wanton behavior, for example, is contrary to the manifest weight of the evidence, but whether the facts of the case warrant imposing punitive damages. Because of the penal nature of such damages, the law disfavors them and requires courts to exercise caution that they not impose punitive damages improperly or unwisely. (*Kelsay v. Motorola, Inc.*) Adherence to these rules compels us to conclude that punitive damages should not be awarded in the case at bar and that the award for $747.30 as such damages was therefore improper.

■■ Although Mr. Schlafly might well have armed himself with further information about the vehicle he sought to confiscate—and will undoubtedly do so in the future—we do not think that his behavior or that of Mrs. Klein in aiding him rises to the level of wilful and wanton conduct. Because of the fairly distinctive appearance of Polichek's vehicle and Schlafly's familiarity with it, however slight, his failure to obtain the license number for the vehicle is less reprehensible than it might be in other circumstances. Another significant fact, though one not mentioned by either party in the briefs, is Schlafly's inquiry of Leyton as to whether Polichek was at work that day and, by inference, whether his vehicle was in the parking lot. With his expectation of finding Polichek's vehicle strengthened, Schlafly's subsequent discovery of a single vehicle in the lot that looked like the relatively uncommon one he expected to find naturally reinforced his belief that plaintiff's vehicle was the one he sought. While we deem Schlafly's conduct cavalier, at best, we cannot say that it evinced such a disregard of the rights of others that it justifies the imposition of punitive damages. A mistake was made, it is true. But it was no more than that. A wanton disregard for the rights of others is not evident. This is best shown by Schlafly's immediate withdrawal upon his discovery that he was dealing with the wrong vehicle.

For the foregoing reasons the judgment of the circuit court of St. Clair County is affirmed as to the award of compensatory damages and reversed as to the award of punitive damages.

Affirmed in part; reversed in part.

KARNS and SPOMER, JJ., concur.