FRANCES E. KEMNER *et al.*, and All Other Cases Consolidated With Cause No. 80—L—970, Plaintiffs-Appellees, v. MONSANTO COMPANY, Defendant-Appellant (Bruce D. Ryder, Appellant; St. Clair County, Appellee).

Fifth District No. 5—88—0420

Opinion filed July 22, 1991.

GREEN, J., specially concurring.
BARRY, J., concurring in part and dissenting in part.

J. Timothy Eaton, of Coffield, Ungaretti, Harris & Slavin, of Chicago, James C. Craven, P.C., of Springfield, and Kenneth R. Heinean, Bruce D. Ryder, and Dudley W. Von Holt, all of Coburn, Croft & Putzell, of St. Louis, Missouri, for appellants.

John Baricevic, State's Attorney, of Belleville, for appellee St. Clair County.

Rex Carr, of Carr, Korein, Tillery, Kunin, Montroy, Glass & Bogard, of East St. Louis, and Jerome W. Seigfreid, of Seigfreid, Runge, Leonatti & Pohlmeyer, of Mexico, Missouri, for other appellees.

JUSTICE LEWIS delivered the opinion of the court:

This case involves an appeal by Monsanto Company from an adverse verdict in favor of 65 plaintiffs in the circuit court of St. Clair County.

An action was brought in the circuit court of St. Clair County, Illinois, by 65 plaintiffs against five defendants: Monsanto Company (Monsanto), Norfolk & Western Railway Company (Norfolk), G.A.T.X. Corporation (GATX), General American Transportation Corporation (General American), and Dresser Industries, Inc. (Dresser). Plaintiffs' 20 original complaints were consolidated for trial. Prior to trial, certain third-party claims against third-party defendant Willamette-Western Corporation were severed from the case. Certain counterclaims against Monsanto and Norfolk were also severed. These third-party claims and counterclaims remain pending in the circuit court. Prior to verdict, all defendants other than Monsanto settled with the plaintiffs.

Plaintiffs' consolidated cases were tried against defendant Monsanto only. Plaintiffs' second amended complaints, which were filed after the close of evidence, were in two counts, alleging in count I a strict liability theory and in count II a wilful and wanton conduct theory. The jury returned a verdict in favor of Monsanto on count I, pertaining to the claim that the product was unreasonably dangerous, and in favor of plaintiffs on count II, awarding no damages for any noneconomic losses, $1 to each of 63 plaintiffs for economic losses, $14,500 each to the other two plaintiffs for property damages losses, and $16,250,000 in a joint punitive damage verdict.

A judgment was entered on the verdicts on October 22, 1987. On November 10, 1987, the court entered a judgment against Monsanto in favor of St. Clair County for extraordinary costs in the amount of $84,294.26. Also at the close of the evidence, but before the jury was instructed, the court fined Monsanto and its counsel Bruce D. Ryder $10,000 and $1,000, respectively, pursuant to section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—611).

Monsanto filed a post-trial motion raising issues pertaining to the October 22, 1987, verdicts on count II, the November 10, 1987, judg-

ment on extraordinary costs and the court's August 27, 1987, order on sanctions. Plaintiffs filed a post-trial motion requesting relief only as to the October 22, 1987, nonpunitive damage verdicts on count II. Both post-trial motions were denied. A finding that there was no just reason for delaying enforcement or appeal was made pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)), in view of the remaining severed counterclaims and third-party claims. Monsanto appeals from the judgment on the verdicts on count II, the judgment on extraordinary costs, and the order on sanctions.

This case arose out of a train derailment and subsequent chemical spill that occurred at Sturgeon, Missouri, on January 10, 1979. The evidence revealed that the defendant sent from its plant in Sauget, Illinois, a shipment by tank car of OCP-crude which contained small quantities of a dioxin called 2, 3, 7, 8-TCDD. The dioxin was formed as a part of the manufacturing process. The train derailed, and a gash on the bottom of the tank car caused some 19,000 gallons of OCP-crude to spill onto the tracks where the train came to rest. There seems to be no question that there was some quantity of dioxin in the OCP-crude and that Monsanto either knew or should have known of this fact. It was also revealed in the evidence that it was some days later before the clean-up crews were notified of the possibility of dioxin in the spill.

The plaintiffs in this case are 65 individuals who were residents of Sturgeon at the time of the spill or who spent time in Sturgeon for various reasons after the spill. Plaintiffs alleged that they suffered personal injuries as a result of exposure to the dioxins contained in the spilled chemicals and that Monsanto was liable for such injuries under theories of strict products liability and wilful and wanton conduct. The jury returned its verdict after hearing evidence for 3½ years and deliberating for eight weeks. It found for Monsanto on the strict products liability count but for plaintiffs on the wilful and wanton conduct count as heretofore set forth.

It would be counterproductive to discuss the evidence in this case with the exception of that relevant to the specific issues addressed in this opinion. The plaintiffs' case in chief lasted some 17 months, and the defendant took 24 months to present its defense. The trial began with jury selection on February 6, 1984, and lasted until the jury returned its verdict on October 22, 1987. The transcript of the proceedings totals 91,555 pages along with some 6,333 exhibits. We will not address any evidence relating to the issues of causation and personal injury damages. The majority of the evidence at trial related to those issues, but since the jury determined that no personal injury occurred,

and no appeal was taken thereon, there is no need to address those subjects.

The defendant, Monsanto, filed a 2,700-page post-trial motion but was required by the court to file an abbreviated motion not to exceed 200 pages. This was not error as all issues have been fully covered and addressed on appeal. Although the defendant-appellant's brief contains many issues and subissues listed in its points and authorities, the brief does set forth the issues on appeal in broader fashion. We will address only those issues that this court feels are necessary to dispose of this appeal. The issues presented by the defendant are:

1. Whether the evidence introduced at trial so overwhelmingly favors Monsanto that the trial court erred in not entering a judgment notwithstanding the verdicts as to count II of plaintiffs' second amended complaints.

2. Whether the misconduct of plaintiffs' counsel during closing argument improperly inflamed the jury to award punitive damages based on passion and prejudice.

3. Whether the trial court erred in not instructing the jury on the law of corporate complicity.

4. Whether plaintiffs' failure to prove any injury or actual damages proximately caused by Monsanto's alleged wilful and wanton conduct requires a judgment notwithstanding the verdicts as to count II of plaintiffs' second amended complaints.

5. Whether the award of punitive damages in this case violates Illinois public policy and the eighth and fourteenth amendments of the United States Constitution and article I, section 2, of the Illinois Constitution.

6. Whether Monsanto is entitled to a new trial or remittitur based on the excessiveness of the award of punitive damages.

7. Whether the trial court erred in admitting certain irrelevant and inflammatory evidence.

8. Whether plaintiffs' attorney's improper trial tactics prejudiced Monsanto.

9. Whether the trial court committed reversible error in refusing to conduct a *voir dire* concerning the jury's exposure to the complete trial transcript and extensive publicity that was prejudicial to Monsanto.

10. Whether Monsanto was deprived of its fundamental right to a fair trial due to the court's conduct of the trial.

11. Whether the trial court erred in imposing sanctions against Monsanto and its counsel pursuant to section 2—611 of

the Code of Civil Procedure. Ill. Rev. Stat. 1987, ch. 110, par. 2—611.

12. Whether the trial court's rulings and procedures denied Monsanto a fair trial under the due process clause of the United States Constitution.

13. Whether the trial court erred in ordering Monsanto's original post-trial motion to stand as a brief in support of a court-ordered amended post-trial motion which was restricted in length.

14. Whether the trial court erred in excluding the testimony of Dr. Renate Kimbrough.

15. Whether the cumulative effect of the trial court's erroneous rulings deprived Monsanto of a fair trial.

16. Whether plaintiffs' case included claims preempted by Federal law.

17. Whether Monsanto is entitled to a setoff of amounts paid to plaintiffs by its settling codefendants.

18. Whether the trial court erred in assessing extraordinary costs against Monsanto in favor of St. Clair County.

19. Whether the trial court erred in denying Monsanto's motion to dismiss on the basis of *forum non conveniens*.

The common-law record, the trial transcripts, exhibits, trial briefs, post-trial motions, and trial rulings are monumental in size and length. However, the succinct way the attorneys for both appellant and appellees handled the appeal in their briefs and arguments has been of great assistance to this court, and all attorneys involved are to be complimented on their presentation. Dealing with the great volume of the record by counsel has been, to say the least, an overwhelming task.

Although there are a great number of issues that could be addressed, the case at bar deals basically with the propriety of the punitive or exemplary damage award in the sum of $16,250,000 assessed in a general verdict. It would seem that a paramount and overriding issue is whether a series of verdicts finding "0" noneconomic loss and "$1.00" economic loss for each of 63 plaintiffs is sufficient to allow the exemplary verdict to stand. An adverse ruling on this issue and the issue of damages to Kemner would require a reversal without remandment, while other issues go to the question of a possible new trial.

The jury returned individual verdicts in favor of each of 63 plaintiffs and assessed damages as follows:

"We assess the compensatory damages as follows:

| Economic loss | $ 1.00 |
|---|---|
| Non[ ]economic loss | $ 0" |

The jury also returned a general verdict which read:

"We, the Jury, assess exemplary damages in the amount of $16,250,000.00."

As to Frances E. and William F. Kemner, the jury assessed damages as follows:

"We assess the compensatory damages as follows:

| Economic loss | $14,500.00 |
|---|---|
| Non[ ]economic loss | $ 0" |

Separate verdicts were returned for each of the Kemners.

Noneconomic damages, in a tort case such as this, are compensation for the actual injury to the plaintiff. Plaintiffs' counsel argued properly in closing argument when he described noneconomic loss as the award for disability and for pain and suffering and economic loss as the award for such things as past and future medical expenses and, in the case of the Kemners, their property damage.

Here, the jury awarded no damages in dollars for injury and nominal damages of $1 for economic loss. Therefore, the question becomes whether a verdict for $16.25 million in punitive damages can stand when there is no damage found for injury and nominal damages for economic loss.

In each of the amended complaints consolidated here the plaintiffs alleged that the defendant committed certain acts and omissions recklessly, wilfully, and wantonly. In the proper case, there is no question that punitive damages can and will be awarded. Our supreme court, on several occasions recently, has considered punitive damages.

In *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 414, 563 N.E.2d 397, 401, the supreme court stated:

"Punitive, or exemplary, damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future. (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 350, 41 L. Ed. 2d 789, 811, 94 S. Ct. 2997, 3012; *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 35[, 330 N.E.2d 509]; Restatement (Second) of Torts §908(1) & Comment *a*, at 464 (1979); Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U. Chi. L. Rev. 1, 7-8 (1982).) Because of their penal nature, punitive damages are not favored in the law. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 203[, 537 N.E.2d 267]; *Kelsay v. Motorola, Inc.*

(1978), 74 Ill. 2d 172, 188[, 384 N.E.2d 353]; *Cornell v. Langland* (1982), 109 Ill. App. 3d 472, 474-75[, 440 N.E.2d 985].) Appropriately enough, the initial decision whether punitive damages may be imposed in a particular case in this State is a matter normally reserved to the trial judge. *J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 453[, 516 N.E.2d 260]; *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 211[, 454 N.E.2d 210]; *Eshelman v. Rawalt* (1921), 298 Ill. 192, 197-98; *cf.* Ill. Rev. Stat. 1987, ch. 110, par. 2—604.1 ***.

Describing the circumstances in which an award of punitive damages is appropriate, this court in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186[, 384 N.E.2d 353,] stated:

'It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others (*Consolidated Coal Co. v. Haenni* (1893), 146 Ill. 614[, 35 N.E. 162].) Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future. (*Eshelman v. Rawalt* (1921), 298 Ill. 192, 197[, 131 N.E. 675].)' "

*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199, developed an excellent analysis of punitive damage awards. The *Hazelwood* court, after analyzing punitive damage law, went on to say:

"Today, the nature of punitive damages in Illinois is clearly singular—it is *punishment* for the defendant. (*Kelsay.*) That punishment is designed in turn to promote three purposes: (1) to act as retribution against the defendant; (2) to deter the defendant from committing similar wrongs in the future; and (3) to deter others from similar conduct." (Emphasis in original.) *Hazelwood*, 114 Ill. App. 3d at 712, 450 N.E.2d at 1207.

However, at this point this court is not bringing into issue whether or not a punitive damages verdict will stand based on the conduct of a defendant, but, rather, we are faced with the preliminary problem of jury verdicts which allowed no damage for injury and $1 for economic loss. The trial judge was faced with this problem when dealing with the post-trial motion for judgment *n.o.v.*

■ Illinois does not recognize a cause of action for punitive damages alone. (*Florsheim v. Travelers Indemnity Co.* (1979), 75 Ill. App. 3d 298, 393 N.E.2d 1223.) Punitive damages in Illinois represent a type of relief rather than an independent cause of action. *McGrew v. Heinold Commodities, Inc.* (1986), 147 Ill. App. 3d 104, 497 N.E.2d 424.

In *Florsheim* the court held that since the plaintiff there could not recover actual damages on the policy or for any other injury, the claim for punitive damages must also fail, citing *Tonchen v. All-Steel Equipment, Inc.* (1973), 13 Ill. App. 3d 454, 300 N.E.2d 616. *Tonchen* states the Illinois rule that does not recognize a cause of action for punitive damages alone; the plaintiff can be awarded punitive damages only where actual damage is shown. (See also *Ecker v. Big Wheels, Inc.* (1985), 136 Ill. App. 3d 651, 483 N.E.2d 639; *Lowe v. Norfolk & Western Ry. Co.* (1981), 96 Ill. App. 3d 637, 421 N.E.2d 971.) In *In re Application of Busse* (1984), 124 Ill. App. 3d 433, 443, 464 N.E.2d 651, 658, the court on appeal upheld the compensatory award and went on to say, "[a]ctual damage having been established to sustain the action for fraud, the trial court did not err in awarding judgment for punitive and exemplary damages." The failure of plaintiffs to allege actual damages but to seek compensation, therefore, could alone be fatal to the counts of the complaint based upon the charges of fraud. The rule in Illinois is that punitive damages may not be awarded in the absence of compensatory damages. *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1985), 137 Ill. App. 3d 84, 484 N.E.2d 349.

Plaintiffs apparently concede in their brief that a punitive damage award must be supported by an actual damage award but argue that nominal damages satisfy that requirement. Defendant argues that it is only when there is an invasion of a legal right, such as an intentional tort, or when it is not possible for plaintiffs to prove the amounts of their loss or damages, that nominal damages can support a punitive award. They further argue that, in the instant case, the plaintiffs alleged that they were physically injured by defendant's conduct and devoted a great portion of the 3½-year trial to prove the extent of their injuries. If plaintiffs had proved their case, they would have been entitled to actual damages. Here, the jury returned "0" for actual injury damage and $1 for economic loss. Their injuries were capable of being calculated, and they, in fact, asked for $34 million in compensatory damages. The plaintiffs attempted to liken wilful and wanton conduct to intentional conduct and cited cases that involved general trespass. However, in the instant case there were neither allegations nor findings of intentional tort. The jury instruction submitted

by the plaintiff and given by the court defining wilful and wanton conduct omitted any reference to intentional conduct. This was not a case of intentional tort or a case where it was impossible to prove damages. The plain fact is that the jury, after $3\frac{1}{2}$ years of trial, found no actual damage but decided to punish the defendant for wrongful acts occurring from 1949 through several years after the incident in Sturgeon, Missouri.

■ Based upon the foregoing, we hold that the punitive damage award must be reversed. The jury found that the plaintiffs suffered no noneconomic damage, and, since there are no underlying compensatory damages, no punitive damage award can stand. Nor will the verdict stand on $1 verdicts for economic loss. As we have indicated, this is not a case where there was an intentional tort alleged nor a case where damages could not be easily computed. The plaintiffs tried this case for punitive damages, and although they argued for actual damages, we believe that the verdicts of $1 per plaintiff for economic loss were entered only to sustain the punitive damages award. The jury found that there was no actual damage, and this verdict was not appealed by plaintiffs. There is, therefore, no underlying tort; thus, the verdict cannot stand. (*Naiditch v. Shaf Home Builders, Inc.* (1987), 160 Ill. App. 3d 245, 512 N.E.2d 1027.) We do not have to consider any conflicts in the evidence, because the jury below made that decision. As was stated in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359:

> "And, while the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law. *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 87[, 174 N.E.2d 157]."

The court in *Embassy/Main Auto Leasing Co. v. C.A.R. Leasing, Inc.* (1987), 155 Ill. App. 3d 427, 432, 508 N.E.2d 331, 335, expressed familiar concerns and cautions of courts with respect to the imposition of punitive damages:

> "Punitive damages are not a favorite in the law (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353; *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199) and should only be allowed with caution and confined within narrow limits (*Quad County Distributing Co. v. Burroughs Corp.* (1979), 68 Ill. App. 3d 163, 385 N.E.2d 1108, *appeal denied* (1979), 75 Ill. 2d 594.) Courts must take caution to insure that they are not improperly or unwisely awarded. *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d

195, 454 N.E.2d 210; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.

Whether to assess punitive damages in a particular case is a question of law. (*Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157.)"

We hold that the trial court erred and abused its discretion in not granting a judgment *n.o.v.* after the verdicts were returned assessing "0" noneconomic loss and $1 economic loss as compensatory damages for each plaintiff.

Although we did not have to address the evidence on the jury verdict question heretofore discussed, we do have to consider the evidence on the issue of the Kemners' land damage (economic loss verdict).

In addition to the $1 verdict for each of 63 plaintiffs for economic loss, the jury returned separate verdicts of $14,500 for economic loss in favor of both Frances E. Kemner and William F. Kemner. These verdicts were for property damage losses. These verdicts also cannot stand and must be reversed. Mr. Kemner testified that, at the time of the spill, he was discussing the possibility of selling land, including both the land for which he was seeking damages and other lands, but after the spill, the purported buyer did not want the land. However, there was no evidence of any kind presented that dioxins came onto the property. There was some spill on the 39 acres in question, but no evidence of dioxin there. The evidence disclosed that, from certain tests made, 2, 3, 7, 8-TCDD, *i.e.*, dioxin, was not specifically identified in the soil. In fact, plaintiffs' expert was specifically told not to test for dioxin.

The Kemners maintained in their second amended complaint that Monsanto wilfully and wantonly failed to remove "toxic substances" (dioxin) from Boone County. Their complaint was with reference to dioxin and not to OCP-crude. The Kemners admitted in their brief that Mr. Kemner did not testify precisely that dioxin caused the diminution in the value of their property, nor did anyone else so testify. The claim was based on dioxin contamination, but no evidence of such contamination came in. The alleged wrongful act of Monsanto was allowing dioxin on the land. The plaintiffs must prove that they were damaged by the wrongful act alleged. In plaintiffs' final argument, they told the jury, "for Frances Kemner and Bill Kemner you have to decide the value of the property that was damaged when the dioxin contaminated it."

From our careful examination of the record, there is no evidence, direct or indirect, that places dioxin on the land in question.

There was some OCP-crude but no dioxin. Further, the circumstantial evidence produced indicated that TCDD binds to the soil and would remain closer to the spill than would phenols. Although phenols did reach the farm in the spring after the spill, even the plaintiffs' evidence tended to prove that dioxin did not accompany the phenols away from the spill site.

> "The general rule of damages in a tort action is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or should not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated. Remote, contingent, or speculative damages do not fall within this general rule." *Siemieniec v. Lutheran General Hospital* (1987), 117 Ill. 2d 230, 259, 512 N.E.2d 691, 706.

We do not believe that the evidence of a small amount of dioxin found in Saling Creek, downstream from the site of the spill, could give rise to an inference that the dioxin would have flowed from the site of the spill onto the Kemner property. The evidence was that the flow was eventually diverted so that the dioxin in all likelihood did not go through or onto the Kemners' property.

The plaintiffs allege and the jury was instructed that the condition of the orthochlorophenol-crude (presence of dioxin) caused damage, but since there was no proof of dioxin present on the Kemners' property, the damage claim must fail. Indeed, there was precious little evidence on land damage. It was limited to the testimony of Kemner and some circumstantial evidence by experts.

The landmark case of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, well established the rule that verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. We believe that in the case of the Kemners' farm damage the record requires and justifies entry of a judgment *n.o.v.* Thus, based upon our analysis of the punitive damage issue and the Kemner compensatory damage issue, we would reverse both verdicts without remandment.

Having decided this, we will also consider other issues that would require reversal and remandment for new trial.

Monsanto asserts on appeal that the trial court committed reversible error through its refusal to instruct the jury that it was necessary to prove "corporate complicity" in order to return a verdict providing

for punitive damages against a corporation. Monsanto submitted its instruction No. 11 to the court, which rejected it. Defendant's instruction No. 11 reads as follows:

> "The Defendant as a corporation can act only through its officers and employees. For purposes of awarding compensatory damages, any act or omission of an officer or employee within the scope of his employment is the action or omission of the Defendant corporation. However, in order to provide a basis for an award of punitive damages against the Defendant, the act or omission which proximately caused this Plaintiffs' [*sic*] injuries must have been authorized, participated in, or ratified by a superior officer of the Defendant corporation."

Monsanto vigorously lobbied for the giving of this instruction in the instructions conference, citing among other cases, *Tolle v. Interstate Systems Truck Lines, Inc.* (1976), 42 Ill. App. 3d 771, 356 N.E.2d 625, in which we held that corporate complicity was required to be proved in order to impose punitive damages against a corporation. The trial court rejected Monsanto's argument and gave plaintiffs' instruction No. 10 over Monsanto's objection.

The court gave plaintiffs' instruction No. 10, which is Illinois Pattern Jury Instructions, Civil, No. 50.11 (2d ed. 1971) (hereinafter IPI Civil 2d No. 50.11):

> "The defendant, Monsanto Company, is a corporation and can act only through its officers and employees. Any act or omission of an officer or employee within the scope of his employment is the action or omission of the defendant corporation."

This instruction is commonly referred to as the *respondeat superior* instruction and was given without modification.

██ The corporate complicity rule stems from this court's decision in *Tolle v. Interstate Systems Truck Lines, Inc.* (1976), 42 Ill. App. 3d 771, 356 N.E.2d 625, and others which followed *Tolle, e.g., Oakview New Lenox School District No. 122 v. Ford Motor Co.* (1978), 61 Ill. App. 3d 194, 378 N.E.2d 544; *Pendowski v. Patent Scaffolding Co.* (1980), 89 Ill. App. 3d 484, 411 N.E.2d 910; *Holda v. County of Kane* (1980), 88 Ill. App. 3d 522, 410 N.E.2d 552; and *Lipke v. Celotex Corp.* (1987), 153 Ill. App. 3d 498, 505 N.E.2d 1213, *appeal dismissed* (1989), 536 N.E.2d 71. This rule is derived from the Illinois Supreme Court case of *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509. As the Federal court noted in *Douglass v. Hustler Magazine, Inc.* (7th Cir. 1985), 769 F.2d 1128, 1146, *Mattyasovszky* "implies though without quite holding that the [corporate complicity] rule is indeed part of the common law of Illinois."

*Mattyasovszky* noted that the punitive and admonitory justifications for the award of punitive damages were sharply diminished in cases where vicarious liability is imposed. The court supported this statement with reference to section 217C of the Restatement (Second) of Agency (Restatement (Second) of Agency §217C (1958)), which states:

> "Punitive damages can properly be awarded against the master or other principal because of an act by an agent if, but only if:
>
> (a) the principal authorized the doing and the manner of the act, or
>
> (b) the agent was unfit and the principal was reckless in employing him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> (d) the principal or a managerial agent of the principal ratified or approved the act."

Drawing on this language in *Mattyasovszky*, this court stated in *Tolle v. Interstate Systems Truck Lines, Inc.* (1976), 42 Ill. App. 3d 771, 773-74, 356 N.E.2d 625, 627, that the supreme court indicated approval of the complicity rule as expressed by the Restatement (Second) of Agency:

> "The complicity rule *** seems consistent with the rationale behind the concept of punitive damages. Either as a basis for punishment or for deterrence of wrongdoers, *some deliberate corporate participation should be shown before this sanction is applied.* [Citation.] The complicity analysis will allow punitive damages where the institutional conscience of the corporate master should be aroused while protecting the corporate master from liability for punitive damages when a properly supervised employee acts with requisite circumstances of aggravation." (Emphasis added.)

We went on to find that there was a paucity of evidence to support the award of punitive damages under the corporate complicity rule where a driver for the truck-line company ignored the rules of the road by switching lanes without a signal and without checking for passing traffic. We found these acts could not be construed as authorized by the defendant, given the fact that there was no evidence introduced to show that the employee was unfit and that the company was liable for employing him, that the employee was acting in a managerial capacity, or that the company ratified the complained-of acts. Where the company could not be shown to be implicated in the acts of

its employees, it was found not to be liable for punitive damages arising from those complained-of acts.

The corporate complicity rule set out in *Tolle* has been adopted in cases from other districts: *Sherman v. Field Clinic* (1979), 74 Ill. App. 3d 21, 392 N.E.2d 154; *Holda v. County of Kane* (1980), 88 Ill. App. 3d 522, 410 N.E.2d 552; *Pendowski v. Patent Scaffolding Co.* (1980), 89 Ill. App. 3d 484, 411 N.E.2d 910; and *Lee v. Heights Bank* (1983), 112 Ill. App. 3d 987, 446 N.E.2d 248.

In *Pendowski v. Patent Scaffolding Co.*, the defendant contended that the trial court erred in submitting IPI Civil 2d No. 50.11, the same instruction which was given in the case at bar. The court held that where a plaintiff seeks to hold a corporate master vicariously liable for its employee's actions, the award of punitive damages for willful and wanton conduct would be available only if the superior officer of the corporation ordered, participated in, or ratified the "outrageous conduct" of the employee. The court found that while the instruction given was valid under other circumstances, it was erroneously given in a situation where a corporation was sought to be held liable for punitive damages vicariously because the instruction would impute liability for any act done by an employee, rather than only those specifically ordered, participated in, or ratified by a superior officer. The court found that it would be necessary to reverse the award of punitive damages even if the plaintiff had presented adequate evidence of the defendant's alleged willful and wanton conduct sufficient to warrant submission of the case to the jury.

The corporate complicity rule is, therefore, the current state of the law in Illinois. This was recognized in *McCarthy v. Paine Webber, Inc.* (N.D. Ill. 1985), 618 F. Supp. 933, wherein the court stated, "Illinois law is clear that *respondeat superior* principles alone will not justify an award of punitive damages against an employer." (*McCarthy*, 618 F. Supp. at 942.) This recognition of the complicity rule is extant as well in *Douglass v. Hustler Magazine, Inc.*, wherein the court stated: "[T]he question is no longer an open one for a federal court in a diversity case governed by Illinois law. *Tolle v. Interstate Systems Truck Lines, Inc.* \*\*\* and *Oakview New Lennox School Dist. No. 122 v. Ford Motor Co.* \*\*\* adopt the complicity rule." *Douglass*, 769 F.2d at 1145.

As noted above, Monsanto objected strenuously to the giving of the *respondeat superior* instruction during the instructions conference.

In their brief plaintiffs admit that *Mattyasovszky* and its progeny hold that punitive damages cannot be awarded against a principal on

a *respondeat superior* theory and adopt the corporate complicity rule. The plaintiffs argue, however, that the language of Monsanto's instruction, wherein it states that a plaintiff's injuries must have been authorized, participated in, or ratified by a "superior officer" of the defendant corporation, was erroneous. Plaintiffs draw on several cases, *Lee v. Heights Bank* (1983), 112 Ill. App. 3d 987, 446 N.E.2d 248, and *Sherman v. Field Clinic* (1979), 74 Ill. App. 3d 21, 392 N.E.2d 154, in support of their assertion that the proper term should be "managerial agent." Plaintiffs contend that the use of the term "managerial agent" is consistent with *Mattyasovszky*, and that *Tolle* and *Pendowski* impose a stricter burden of proof on the plaintiffs through their use of the term "superior officer" in regard to the corporate complicity rule. Although plaintiffs assert that there is "a big difference" between the terms, no case law is cited in support of this contention.

"Managerial employee" is defined in *Illinois State Journal-Register, Inc. v. National Labor Relations Board* (7th Cir. 1969), 412 F. 2d 37, 41-42, as an employee who formulates, determines and effectuates his employer's policies, one with discretion or authority to make ultimate determinations independent of company consideration and approval of whether a policy should be adopted. "Managing agent" is defined as an employee who acts with supervisory authority, being invested with general powers to exercise discretion and judgment in dealing with corporate matters; his interests are identified with those of the corporation in *Heater v. Chesapeake & Ohio Ry. Co.* (7th Cir. 1974), 497 F.2d 1243, 1248. The Illinois Appellate Court case of *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 908-10, 493 N.E.2d 1130, 1137-38, defines "managerial employee" as someone who is formulating, determining, and effectuating policy in the context of the National Labor Relations Act.

*Pendowski* uses the term "superior officer," as does *Tolle*, in discussing the basis for corporate complicity liability for punitive damages assessed vicariously without discussion of what constitutes a superior officer. However, *Tolle* cites *Roginsky v. Richardson-Merrell, Inc.* (2d Cir. 1967), 378 F.2d 832, 842, for the proposition that "superior officers" must order, participate in, or ratify outrageous misconduct in order to hold a corporate master liable for punitive damages. That case states that punitive damages may not be imposed upon a corporation

> "unless, as charged [by the court], 'the officers or directors, that is, the management' of the company or the relevant divi-

sion 'either authorized, participated in, consented to or, after discovery, ratified the conduct' giving rise to such damages. [Citations.] New York, in other words, adheres to the 'complicity rule,' holding the corporate master liable for punitive damages 'only when superior officers either order, participate in or ratify outrageous conduct'." (*Roginsky*, 378 F.2d at 842.)

A footnote to this discussion indicates that in that case the defendant asserted, and the plaintiff did not dispute, that for the purposes of applying the complicity rule to that case, "management" included only the presidents and vice-presidents of the corporation, and that the court did not have to decide whether, under New York law, the acts of inferior supervisory employees would otherwise be deemed the acts of the corporation for purposes of assessing punitive damages. *Roginsky*, 378 F.2d at 842 n.18.

It would appear, therefore, that *Tolle* and its progeny would require deliberate corporate participation by and through its officers or directors in order to fulfill the requirements of the complicity rule for purposes of imposing punitive damages on the corporation vicariously.

The plaintiffs cite *Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267, for the proposition that it is not necessary for a corporation to act through an officer in order to be held liable for punitive damages. The *Byford* case involved an assault by an apartment manager on a tenant wherein the supreme court found that the admission that Byford was the resident manager of the apartment complex and an agent for SRP Associates, his employer, was sufficient to satisfy the standard, discussed with approval in *Mattyasovszky*, of the Restatement (Second) of Agency section 217C (1958) for the imposition of punitive damages as to a principal where the agent is employed in a managerial capacity and is acting within the scope of his employment. The plaintiffs assert that *Deal v. Byford* allows imposition of punitive damages where the complained-of acts were not perpetrated by an officer, let alone a superior officer, and that if they are perpetrated by a "managerial agent," the corporate complicity rule is fulfilled. However, in *Deal v. Byford*, the discussion was made in connection with liability of what appears from a careful reading of the case to be a partnership not a corporation, the agency's and agent's roles as manager were based on an assertion of the purported agent, and there was no discussion of the proper wording of the instruction on punitive damages given to the jury. Furthermore, as Monsanto points out, *Deal v. Byford* was published March 22, 1989, 19 months after the charging of the jury in the case at bar.

Monsanto tendered its instruction based on this court's language in regard to the corporate complicity rule in *Tolle*. It supported the submission of its instruction with reference to both *Tolle* and *Pendowski* and pointed out that *Pendowski* had explicitly rejected IPI Civil 2d No. 50.11 in cases where the corporate complicity rule applied. Monsanto asserts that the plaintiffs' closing argument further compounded the error of giving the *respondeat superior* instruction.

It would appear that, given the state of the law at the time the case went to the jury, it was inappropriate to give IPI Civil 2d No. 50.11. As noted in *Pendowski*, this instruction, while valid under other circumstances, was ill-suited to convey the correct principles of law to the jury, since it could impute liability for *any* act done by an employee, rather than only those specifically ordered, participated in, or ratified by a superior officer. (*Pendowski v. Patent Scaffolding Co.* (1980), 89 Ill. App. 3d 484, 411 N.E.2d 910.) The court in *Pendowski* found that it would be required to reverse the outcome at the trial level as to the punitive damages issue based on the erroneous instruction even if the plaintiff presented adequate evidence of the company's alleged wilful and wanton conduct so as to warrant submission of the case to the jury. As in *Pendowski*, this erroneous instruction would require a reversal and remand.

The appellant raises many other major issues including excessiveness of verdict, irrelevant and improper trial tactics, failure to conduct *voir dire* concerning extensive publicity, court's conduct, exclusion of certain testimony, cumulative effect of erroneous court rulings, and several others. In light of our determination expressed above to reverse the judgment of the trial court with respect to those questions already discussed, resolution of these issues is not crucial to our decision.

Monsanto maintains that the circuit court erred in denying its motion for dismissal on the issue of *forum non conveniens*. Monsanto further asserts that the clear precedent set in this court in *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 463 N.E.2d 792, mandates reversal. Although *Lowe* arises out of the same occurrence as in the instant case, the parties are not the same. In *Lowe* the plaintiffs were employees of the Railway and the defendant was the Railway. In the instant case the plaintiffs are residents of the site of the occurrence and the defendant is Monsanto, a manufacturer. Monsanto's plant was in St. Clair County, Illinois, and many of the claims center around the defendant's acts and omissions in St. Clair County.

Although this court could reverse, even after trial, as in *Lowe*, it is interesting to note that the arguments made now are basically the same ones made earlier in this cause. This court previously denied defendant's petition for leave to appeal on the *forum non conveniens* issue, and that order was upheld by the supreme court on December 4, 1986. 113 Ill. 2d 560.

Recently, the Illinois Supreme Court has had the opportunity to discuss thoroughly the problems and issues arising in forum cases. (See *Boner v. Peabody Coal Co.* (1991), 142 Ill. 2d 523, 568 N.E.2d 883; *Griffith v. Mitsubishi Aircraft International, Inc.* (1990), 136 Ill. 2d 101, 554 N.E.2d 209.) *Boner* and *Griffith* both were intrastate cases, but the factors to be considered are equally applicable to both intrastate and interstate cases. (*Torres v. Walsh* (1983), 98 Ill. 2d 338, 456 N.E.2d 601.) The sole issue in the instant case is whether the circuit court abused its discretion in denying Monsanto's motions to dismiss based on *forum non conveniens*. The supreme court has consistently held that a trial court is vested with broad discretion in ruling on a *forum non conveniens* motion; its decision will be reversed only if it is shown that the court abused its discretion in weighing relevant considerations. (*Meyers v. Bridgeport Machines Division of Textron, Inc.* (1986), 113 Ill. 2d 112, 497 N.E.2d 745.) The test is whether the relevant factors, viewed in their totality, strongly favor transfer to the forum suggested by defendant. *Griffith*, 136 Ill. 2d 101, 554 N.E.2d 209.

We have reviewed and considered all of the factors, both private and public, and find that the circuit court did not abuse its discretion in denying the motion to dismiss. We distinguish the instant case from *Lowe* based upon the location and importance of the Krummrich plant. That important factor along with the plaintiffs' preference, the number of Illinois witnesses, and convenience to out-of-State witnesses favor the trial court's decision.

Monsanto maintained and argued on appeal that plaintiffs' case included claims that were preempted by Federal law, based upon preemption due to Federal statute as well as preclusion due to impact upon commerce. We disagree. Plaintiffs argue correctly that there was no allegation concerning the shipment of OCP-crude or dioxins. Count II alleged that Monsanto recklessly wilfully and wantonly failed to test in its plant for dioxin; failed to remove dioxins; failed to warn inhabitants of Boone County promptly; and failed to warn those persons engaged in removal to adequately protect plaintiffs. There appears to be no claim that the product was improperly shipped. It is clear that since the Hazardous Materials Transportation Act (Trans-

portation Act) (49 U.S.C. app. §1801 *et seq.* (1988)) governs the transportation of hazardous materials and, since the plaintiffs basically allege no negligence in the shipment, as set forth above, there is no preemption.

Even if there was a sufficient connection with shipment, the claims would not be preempted. Section 1811 (49 U.S.C. app. §§1811(a),(b) (1988)) of the Transportation Act states in pertinent part as follows:

"(a) General

Except as provided in subsection (b) of this section, any requirement, of a State or political subdivision thereof, which is inconsistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is preempted.

(b) State laws

Any requirement, of State or political subdivision thereof, which is not consistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is not preempted if, upon the application of an appropriate State agency, the Secretary determines, in accordance with procedures to be prescribed by regulation, that such requirement (1) affords an equal or greater level of protection to the public than is afforded by the requirements of this chapter or of regulations issued under this chapter and (2) does not unreasonably burden commerce. Such requirement shall not be preempted to the extent specified in such determination by the Secretary for so long as such State or political subdivision thereof continues to administer and enforce effectively such requirement."

This section applies to regulations but would also apply to the common law. We believe that it is quite clear that the preemption doctrine does not prevent States from imposing common law tort standards stricter than those imposed by prevailing Federal law. See *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534; *Ginn v. Consolidated Coal Co.* (1982), 107 Ill. App. 3d 564, 437 N.E.2d 793.

Since we are reversing this cause, we feel that it is unnecessary to go into an in-depth analysis of this issue other than to hold that under all the circumstances in this case there is no Federal preemption.

Monsanto also argued that large awards of punitive damages between private parties may be an excessive fine in violation of the

eighth amendment of the Federal Constitution. This contention has been rejected by the United States Supreme Court. (See *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.* (1989), 492 U.S. 257, 106 L. Ed. 2d 219, 109 S. Ct. 2909.) Monsanto also raises the due process constitutional claim. The Supreme Court on March 4, 1991, found that the "punitive damages assessed by the jury against Pacific Mutual were not violative of the Due Process Clause of the Fourteenth Amendment." (*Pacific Mutual Life Insurance Co. v. Haslip* (1991), 499 U.S. ____, ____, 113 L. Ed. 2d 1, 20, 111 S. Ct. 1032, 1044.) The Supreme Court went on to say, "As long as discretion is exercised within reasonable constraints, due process is satisfied." 499 U.S. at ____, 113 L. Ed. 2d at 21, 111 S. Ct. at 1044.

 We find particularly troublesome one other major issue. That issue involves the admission of a great deal of evidence concerning incidents occurring both before and after the spill precipitating this lawsuit. We do not intend to go into detail concerning this issue because of our prior determination, but we are of the opinion that allowing evidence of dissimilar incidents that occurred prior to the spill and evidence concerning 2, 3, 7, 8-TCDD in Lysol and Weed-B-Gone, because it involved "post-spill conduct," was improper.

Monsanto sought to preclude admission of the evidence of prior dissimilar incidents, but its efforts were in vain. Plaintiffs maintained that Monsanto spread dioxin-contaminated chlorophenols throughout the world for 20 years and knew about it. They also used this evidence to bolster the credibility of their expert, Dr. Carnow. However, the law is that evidence of prior incidents is admissible when those incidents are similar in nature to the conduct giving rise to the litigation. The plaintiffs argued that the purpose of the testimony was not to show that the incidents were similar but to demonstrate Dr. Carnow's knowledge concerning dioxins and its effect on human beings. Given the massive amount of evidence on this subject, we reject that contention.

*Loitz v. Remington Arms Co.* (1988), 177 Ill. App. 3d 1034, 532 N.E.2d 1091, held that prior incidents of a similar nature are admissible to show a conscious disregard for the safety of others. The supreme court reversed, but on the ground that, although that testimony was admissible, it failed to demonstrate Remington's awareness. In other words, the evidence was not sufficient. *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 563 N.E.2d 397.

*Bass v. Cincinnati, Inc.* (1989), 180 Ill. App. 3d 1076, 1083-84, 536 N.E.2d 831, 835, held:

"In summary, we hold that evidence of similar post-accident occurrences or injuries involving the same or substantially similar products may not be used to show that a manufacturer acted in conscious disregard of the safety of others and cannot support a claim for punitive damages."

We are of the opinion that the admission into evidence of testimony concerning a great deal of the prior incidents and all of the subsequent incidents was error, and, if we were not inclined to reverse as set forth earlier in this opinion, we would reverse and remand on this issue.

There remain two issues on appeal that must be addressed. Those issues are: (1) the imposition of sanctions upon Monsanto and Bruce D. Ryder, an attorney for Monsanto; and (2) the entry of an order directing Monsanto to reimburse St. Clair County, Illinois, for certain expenses.

Appellant, Monsanto, asserts on appeal that the trial court erred when it imposed sanctions, pursuant to section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—611), upon both Monsanto and attorney Bruce D. Ryder *sua sponte*.

The plaintiffs fail to address this argument directly in their brief. Although they do discuss the imposition of sanctions under section 2—611 by the court, they do so only in support of their position that the trial court did not demonstrate prejudice against Monsanto through the imposition of sanctions under section 2—611. Even though we feel that the Kemners do not address the issue raised by Monsanto with sufficient clarity or citation of authorities, a brief discussion of the issue is warranted.

Following the court's dismissal of juror McCann and the replacement of this juror by an alternate juror, Monsanto argued vehemently against the dismissal and replacement during an *in camera* discussion. At that time, Monsanto suggested that the court should consider recusing itself, alleging that the dismissal of McCann demonstrated bias on the part of the court. The court characterized the remarks of the Monsanto attorney as uncalled for and the request for recusal as being made without basis.

The next day, August 27, 1987, Monsanto filed a motion seeking reconsideration of the court's order dismissing juror McCann or, in the alternative, asking the court to declare a mistrial. Monsanto argued that because the court denied what became a joint motion to dismiss juror McCann in March 1986, the court's entry of the order dismissing juror McCann was inappropriate even though plaintiffs' attorney moved to do so again on August 26, 1987. The motion ques-

tioned the basis for the dismissal and asserted that Monsanto was injured by not being provided any notice in advance of the court's decision, thus preventing it from generating a documented response to the court's asserted basis for its action. Monsanto challenged the court's statement to juror McCann that the attorneys and the court had agreed to have her removed from the jury. It also faulted the court for failing to *voir dire* the juror in order to determine whether or not she was, in actuality, prejudiced against the plaintiffs. The motion characterized the court's action as an apparent effort to diminish the number of jurors sitting on the final jury panel who were perceived by the court to be receptive to the defendant's case.

The court heard argument *in camera* on August 27, 1987. At that time, the court discussed its decision to replace juror McCann. It characterized the Monsanto motion as one fraught with misrepresentation and, thus, a violation of section 2—611 of the Code of Civil Procedure. The court then assessed against Monsanto a sanction in the sum of $10,000 and assessed against the attorney who signed the original motion, Bruce D. Ryder, a sanction in the sum of $1,000. The court awarded attorney fees to plaintiffs' counsel in the amount of $500. It refused at that time to stay the order. The next day, August 28, 1987, the court issued a stay of execution of the previous day's order imposing sanctions and attorney fees and denied defendant's oral motion to vacate the sanctions previously imposed. On November 10, 1987, the court entered a written order denying the defendant's motion to vacate the 2—611 findings. However, that same order stated that the court would not impose any sanctions based on those findings.

At the time of the prehearing conference conducted for this appeal on August 17, 1988, in the appellate court, pursuant to Supreme Court Rule 310 (134 Ill. 2d R. 310), the parties agreed that the plaintiffs-appellees would be estopped from contesting the issue of the appropriateness of the application of sanctions against appellant Bruce D. Ryder and stipulated that the plaintiffs-appellees conceded the issue. An order issued by this court on August 18, 1988, filed August 22, 1988, reflects this stipulation and concession.

The posture of this issue on appeal is, then, as follows: the violation of section 2—611 in regard to Monsanto remains a viable issue, but because of the trial court's order of November 10, 1987, the sanctions imposed pursuant to section 2—611 are not in issue. Neither the alleged violation of section 2—611 nor the sanctions imposed against Bruce D. Ryder are in issue as a result of both the November 10,

1987, order of the trial court and the order entered in this case on August 18, 1988.

■■■ Section 2—611 of the Code of Civil Procedure is, in its present form, which became law on November 25, 1986, drawn directly from Federal Rule of Civil Procedure 11 (Rule 11). (*Western Auto Supply Co. v. Hornback* (1989), 188 Ill. App. 3d 273, 545 N.E.2d 764.) Federal case law interpreting Rule 11 of the Federal Rules of Civil Procedure can be examined as an aid to interpretation of section 2—611. *Frisch Contracting Service Co. v. Personnel Protection, Inc.* (1987), 158 Ill. App. 3d 218, 511 N.E.2d 831.

■■■ By its mere existence, Rule 11 serves to give attorneys notice and knowledge of the standards of conduct required by the rule. (*Donaldson v. Clark* (11th Cir. 1987), 819 F.2d 1551.) Under Federal Rule 11, sanctions cannot be imposed upon a client unless that client has actual knowledge that the offending paper filed constituted wrongful conduct under the rule. (*Cross & Cross Properties, Ltd. v. Everett Allied Co.* (2d Cir. 1989), 886 F.2d 497.) Due process demands more specific notice beyond the mere existence of Rule 11 when Rule 11 sanctions are contemplated in regard to a client, due to the fact that a client is not likely to be aware of the existence of the rule and needs the opportunity to prepare a defense. *Donaldson*, 819 F.2d 1551.

Offending parties, both clients and attorneys, should be given notice as early as possible in order to deter further violations of the rule and conserve judicial resources. (*In re Yagman, Brown & Fleischer v. Baden & Weinberg* (9th Cir. 1986), 796 F.2d 1165.) As the advisory committee notes to Federal Rule 11 indicate, "[e]ven though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client. *** A party seeking sanctions should give notice to the court and the offending party promptly upon discovering a basis for doing so." (28 U.S.C.A. Rule 11, Committee Comments, at 425 (West Supp. 1990).) In the case at bar, the court imposed sanctions on Monsanto and its attorney *sua sponte*, without providing notice to Monsanto, as the client of the attorney, that the court had determined the Monsanto motion to reconsider the dismissal of juror McCann a filing made in bad faith. Although the rule does not mandate that a separate hearing be held prior to the imposition of sanctions:

> "[W]hen a court is asked to resolve an issue of credibility or to determine whether a good faith argument can be made for the legal position taken, the risk of an erroneous imposition of sanctions under limited procedures and the probable value of

additional hearing are likely to be greater. Prior opportunities to respond to Rule 11 charges will also influence the extent to which further hearing is necessary.

*** The more serious the possible sanction both in absolute size and in relation to actual expenditures, the more process that will be due." *Donaldson*, 819 F.2d at 1561.

■ In the case at bar, substantial monetary sanctions were levied against both Monsanto and one of its attorneys without prior notice of the court's intention to impose a sanction pursuant to section 2—611, thus short-circuiting the due process rights of both Monsanto and its attorney. In view of the fact that Monsanto was a client, and the considerable size of the monetary sanction imposed against it, notice to Monsanto was inadequate, and the lack of opportunity for a meaningful hearing impermissibly abridged Monsanto's due process rights. The award of attorney fees is also improper. The trial court's finding of a violation of section 2—611 with regard to Monsanto is therefore reversed.

Monsanto asserts that the trial court erred in issuing an order directing it to reimburse St. Clair County for expenses incurred during the trial amounting to $84,284.96 for juror fees, juror mileage, juror meals during deliberation, juror parking fees, and the cost of constructing an annex for use as a storage room for evidence. We agree.

■ ■ Juror fees and travel expenses are the responsibility of the county for which the jurors provide their services (Ill. Rev. Stat. 1987, ch. 53, par. 62). The juror *per diem* and mileage fees are to be taken from the county treasury and cannot be taxed as costs against the losing party. (*Chicago, Peoria & St. Louis Ry. Co. v. Eaton* (1891), 136 Ill. 9.) Jury fees cannot be assessed as costs. (*People v. Kluck* (1979), 70 Ill. App. 3d 582, 388 N.E.2d 1918; *People v. Hanei* (1980), 81 Ill. App. 3d 690, 403 N.E.2d 16.) The trial court's assessment of $72,750 for jurors' *per diem* and mileage expenses against Monsanto is reversed.

■ Likewise, the taxing of juror parking fees and meals for jurors during deliberations as costs against Monsanto was improper. No statutory authority mandates the payment of personal expenses incurred by jurors in the performance of their duties by the county for which they serve. (See *Sexton v. Henderson* (1891), 42 Ill. App. 234.) By extension, if the county does not have to pay jurors for monies expended on dining and parking while serving, the losing party does not have to do so, in the absence of statutory authorization. No statute authorizes taxation of jurors' personal expenses as costs against a losing party. The trial court's order assessing $6,540.96 as costs against

Monsanto for jurors' personal expenses was erroneous. We reverse the award of $6,540.96 to St. Clair County for jurors' personal expenses.

 The order of the trial court charging to Monsanto the cost of building an annex to store evidence connected with this cause of action similarly lacks a basis in law. While courts may make rules or orders under which costs can be taxed or imposed, the ultimate authority for the power to impose costs on a party must be found in the statutes, and any statute allowing the recovery of costs must be strictly construed. (*Gruidl v. Schell* (1988), 166 Ill. App. 3d 276, 519 N.E.2d 963.) "Costs" are allowances in the nature of incidental damages made pursuant to statute to reimburse the prevailing party for expenses which were necessarily incurred in the assertion of the prevailing party's rights in court. (*Naiditch v. Schaf Home Builders, Inc.* (1987), 160 Ill. App. 3d 245, 268, 512 N.E.2d 1027, 1041.) The County of St. Clair is not the "prevailing party" in the instant case, and thus the cost of constructing the storage room is clearly not taxable to Monsanto as a "cost" to the prevailing party.

*Thurston v. Department of Employment Security* (1986), 147 Ill. App. 3d 734, 737, 498 N.E.2d 864, 866, defined "fees" as being "compensation to public officers for services rendered individuals, in the progress of the cause," citing 20 C.J.S. *Costs* §1 (1984) and *Galpin v. City of Chicago* (1910), 159 Ill. App. 135, 166, *aff'd* (1911), 249 Ill. 554, 94 N.E. 961. While money expended for filing fees and jury demand fees can be awarded to a prevailing party because they were fees incurred in the pursuit of a case, no statute exists for assessing such fees in favor of the county.

The funding of capital improvements to the courthouse by unsuccessful litigants is not supported by either statutory authority or case law. It cannot be characterized as a "fee" for services performed by a public official that would be taxable to a losing party. The language in the order of November 10, 1987, which characterizes the expenses as being "above and beyond regular costs and upkeep of the court," cannot be utilized to make an award to the county for those expenses, in the absence of statutory authority. The award to St. Clair County of $4,994 for the cost of constructing a room in which to store evidence was improper. We reverse the order directing Monsanto to pay $4,994 for the cost of building a storage room to house exhibits.

The order assessing costs in favor of St. Clair County is reversed in its entirety.

In summary, our disposition of this appeal is as follows: (1) that part of the judgment of the trial court entered on the verdict award-

ing plaintiffs $16,250,000 in punitive damages is reversed; (2) that part of the judgment of the trial court entered on the verdict awarding the Kemners $14,500 each is reversed; (3) that part of the judgment of the trial court entered on the verdict awarding 63 plaintiffs other than the Kemners $1 each for economic loss is reversed; (4) the order of the trial court awarding costs to St. Clair County in the amount of $84,284.96 is reversed; and (5) the trial court's finding of a violation of section 2—611 as to Monsanto is reversed. Based on the above, the judgment is reversed. We further hold that based upon our discussion of the error, other than the reversible error, this cause would, in the alternative, have to be reversed and remanded for a new trial.

Reversed.

JUSTICE GREEN, specially concurring:

The expressed policy of the Illinois Supreme Court in regard to awarding punitive damages is well set forth in the opinion of the court written by Justice Lewis. Frequently, as of late in *Loitz*, that court has warned that because of the penal nature of punitive damages, they "are not favored in the law." (*Loitz*, 138 Ill. 2d at 414, 563 N.E.2d at 401.) In *Pacific Mutual Life Insurance Co. v. Haslip* (1991), 499 U.S. ___, 1. L. Ed. 2d 1, 111 S. Ct. 1032, the United States Supreme Court held that an award of punitive damages does not necessarily violate due process. However, the majority opinion there began its analysis by reciting the concerns which the members of that court had previously expressed as to whether award of punitive damages in civil cases is constitutionally permissible. That opinion then stated, "[w]e note once again our concern about punitive damages that 'run wild.' " *Haslip*, 499 U.S. at ___, 113 L. Ed. 2d at 20, 111 S. Ct. at 1043.

I concur in the decision to reverse without remandment and in the decision, in the alternative, merely to grant a new trial if our decision to reverse outright does not stand. I agree with the reasoning of the opinion of Justice Lewis. I write separately only to explain policies which I deem inherently involved in our decision and which I consider necessary to prevent punitive damages that do "run wild." These policies concern whether punitive damages can be based upon merely nominal damages and the consideration to be given to evidence that a tortfeasor against whom punitive damages are sought has committed other similar acts of misconduct.

Justice Lewis correctly points out that no decision of an Illinois court of review has passed directly upon the question of whether punitive tort damages may be predicated upon nominal damages, but that the language in various cases indicates that actual damages, which appear to be something more than nominal damages, are required. The opinion also carefully explains that (1) no conduct involving intent to harm is present here; and (2) had the jury found the plaintiffs, other than the Kemners, received actual injury, damages larger than nominal damages could have been calculated and awarded. Thus, two of the strongest reasons for award of punitive damages based only on nominal damages are not present. Accordingly, the case differs from *Brown & Williamson Tobacco Corp. v. Jacobson* (7th Cir. 1987), 827 F.2d 119, where, applying Illinois law, that court in a defamation case upheld an award of punitive damages predicated upon an award of only nominal damages. That court emphasized that (1) the conduct of that defendant was libelous *per se*, giving rise to a presumption of substantial damages; and (2) malice was shown.

In asking that we hold that punitive damages cannot be based upon the award of merely nominal economic damages to the non-Kemner plaintiffs, defendant is not requesting overruling of prior precedent. It is merely stating we should not extend the operation of punitive damage awards to those whose incidence to the allegedly wrongful conduct is so slight that they are not entitled to compensation of any substance. Under such circumstances, a decision based upon policy seems most appropriate.

A leading text on the law of torts points out that a majority of States do not permit recovery of punitive damages predicated upon only nominal damages but states that "[s]ince it is precisely in the cases of nominal damages that the policy of providing an incentive for plaintiffs to bring *petty outrages* into court comes into play," the better "view" is to allow punitive damages based on nominal damages. (Emphasis added.) (W. Keeton, Prosser & Keeton on Torts §2, at 14 (5th ed. 1984).) However, that text also recognizes that, in recent years, the policy of permitting exemplary damages in tort litigation has come under special scrutiny as the *Haslip* and *Loitz* cases indicate.

The *Loitz* opinion cites a law review article by Professor David G. Owen, a scholar who is, in general, a proponent of the use of punitive damages. (Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U. Chi. L. Rev. 1 (1982).) Professor Owen states the proliferation of large exemplary damage awards against large manufacturers in product liability cases has

caused him to conclude that some modifications of the law applicable to those types of cases is desirable. He does not discuss the question of predicating punitive damages upon nominal damages, but he does advocate taking steps to minimize the size of and proliferation of punitive damages awards in cases against large manufacturers.

In cases such as that before us, permitting people who did not receive any measurable injury to recover punitive damages greatly increases the exposure of the alleged tortfeasor. One plaintiff here, permitted to share in the $16,250,000 punitive damage award, did not come to Sturgeon until the summer of 1979, well after the January 1979 spill. She stayed there for 27 days, spending the hours of 9 a.m. until 5 p.m. on all but two of those days visiting her mother in a hospital in Mexico, Missouri, less than 25 miles away. Another such plaintiff lived in Columbia, Missouri, a similar distance away, and had not been in Sturgeon during the time of the spill or cleanup. However, she had washed the clothes of her husband, who spent three or four hours a day in Sturgeon during the time of the cleanup collecting trash. One of his customers had a place of business near the site of the spill, and another of his customers was involved in the cleanup. According to that plaintiff's husband, on one occasion a glass jar, containing mud and water and found in the rubbish of the latter customer, broke and spilled on that husband. He testified he felt a burning sensation from that spilled liquid and immediately washed himself. The plaintiff wife testified she smelled a strong odor upon washing her husband's clothing. She complained of a panoply of illness and physical repercussions extending from headache and depression to loss of libido and menstrual problems.

The jury could have properly concluded that the misconduct of defendant was of such a character as to justify very substantial punitive damage awards. If nobody was shown to receive any measurable personal injury from this conduct, permitting an award of punitive damages to someone would serve the purposes of punishing a tortfeasor who should be punished, discouraging others from similar conduct, and rewarding plaintiffs for and compensating them for their expenses in imposing sanctions for dangerous and highly improper conduct. However, when such a wide group of persons having little close connection with the occurrence involving the tort are permitted to recover punitive damages limited, at best, only by some otherwise undefined standard of reasonableness, a real danger of punitive damages that "run wild" exists. Here, we do not know how many other people could also sue claiming nominal damages. The tort alleged here

does not appear to be subject to any statute of repose. Minors could sue many years into the future.

In view of the well-documented concern about the proliferation and size of punitive damage awards, I conclude that the better policy requires generally limiting punitive damage awards for unintentional torts to those who suffer more than nominal damage. As I have indicated, I agree with the conclusion of Justice Lewis that existing precedent does not appear to permit the award of punitive damages to those receiving only nominal economic damages here. I also consider public policy considerations support that holding.

Another need for limitation in regard to punitive damage awards arises here from plaintiffs' attempts to use evidence of other occurrences to prove the wilful nature of defendant's improper conduct. I agree with Justice Lewis that, under the supreme court decision in *Loitz* and that of the First District Appellate Court in *Bass*, much of the evidence of those occurrences should not have been admitted. Prejudice to defendant was compounded when, in closing argument, plaintiffs' counsel indicated to the jury that the jury should not only consider this evidence as bearing upon the severity of defendant's misconduct for which damages were sought here, but that the jury should, by a punitive damage award here, punish defendant for its conduct on those other occasions. If evidence of other misconduct of a defendant is properly received to show the wilfulness of that defendant's misconduct in the occurrence giving rise to the case on trial, great care by the trial court is required in its rulings upon the receipt and use of such evidence. Any failure to do so is also likely to cause punitive damage awards to "run wild."

JUSTICE BARRY, concurring in part and dissenting in part:

I cannot subscribe to what I deem to be an illogical approach by my colleagues to reach a desired policy result. The main opinion, with only a belated allusion to *Pedrick*, reverses outright, delivering the crowning blow to 3½ years of tireless, dedicated work by the trial judge, court personnel, and the jurors who heard a truckload of evidence, deliberated for eight weeks, and then rendered verdicts which were confirmed in post-trial procedures.

The main opinion alludes to the quantity of evidence (some 91,555 pages of transcribed proceedings and 6,333 exhibits) and then dismisses it all, ostensibly because "the jury determined that no personal injury occurred, and no appeal was taken thereon." (217 Ill. App. 3d at 194-95.) I don't doubt but that the jurors on reading this opinion will be sorely surprised, perhaps even appalled, to learn what they

"determined." It may well be true that the evidence presented in this trial, the longest running civil trial in the history of American jurisprudence, is unmanageable for purposes of our review, but a jury heard it all and so did a trial judge. I think we must consider that evidence and determine if in fact "all of the evidence, when viewed in its aspect most favorable to [the plaintiffs], so overwhelmingly favors [Monsanto] that no contrary verdict based on that evidence could ever stand." (*Pedrick*, 37 Ill. 2d at 510, 229 N.E.2d at 513-14.) This my colleagues have failed to do under the guise of unprecedented and, by my view, convoluted "legal" rationale, *i.e.*, the jury found $0 noneconomic damages, ergo the jury found no "actual damages," ergo the jury found "no injury," and that finding is inviolable (this being implicit in the main opinion); thus, judgment belongs to the defendant. It is axiomatic that the jury's verdict, even reduced to ink and paper, is not "evidence" as contemplated by *Pedrick*. Moreover, none of the precedent cited in the main opinion stands for disregarding the *Pedrick* standard when reviewing motions for judgment *n.o.v.* My colleagues have gathered their impressions of the jury's findings from entries on an itemized verdict form and then, drawing from inapposite case law, rationalize their rejection of the verdicts "as a matter of law."

The majority's approach violates a cardinal rule of appellate review that we "are not in the business of second-guessing a jury's 'clear intent.'" (*People v. Spears* (1986), 112 Ill. 2d 396, 409, 493 N.E.2d 1030, 1035.) In this case, the jury by its verdicts found: (1) that plaintiffs proved defendant's liability for wilful/wanton misconduct; (2) that plaintiffs established their entitlement to *nominal compensatory damages*; and (3) that defendants should be punished for their misconduct. I would attach no significance to the fact that the jurors awarded their $1 nominal damages in the space prelabelled "economic" on the itemized verdict form rather than in the "noneconomic" space.

I believe it significant that the same position being espoused by the main opinion here was summarily rejected by the court in *Harriss v. Elliott* (1991), 207 Ill. App. 3d 384, 387, 565 N.E.2d 1041, 1043. In *Harriss*, as here, the jury entered "$0" in the spaces for noneconomic damages. In the space designated for "the reasonable expense of necessary medical care, treatment and services received"—*i.e.*, economic damages—the jury entered "$140.75." In the space for "punitive damages," the jury entered "$5,000." Judgment was entered accordingly. Defendant on appeal argued, as here, that plaintiff was entitled to no

award because he suffered "no injury." The court disagreed, holding simply:

> "[P]laintiff did receive compensation for 'reasonable' and 'necessary' medical expenses. There is nothing in the record before us to contradict this finding by the jury, and we must presume the award had a sufficient factual basis. *Foutch [v. O'Bryant* (1984), 99 Ill. 2d 389,] 392, 459 N.E.2d 958." 207 Ill. App. 3d at 387, 565 N.E.2d at 1043.

In like manner, the court in *Perry v. Storzbach* (1990), 206 Ill. App. 3d 1065, 1069-70, 565 N.E.2d 211, 214, approved a jury's verdict awarding $0 for pain and suffering and $35,000 for "the disability resulting from the injury." On appeal, defendant challenged the verdict as inconsistent. The court, after reviewing relevant precedent and the evidence presented to the jury, disagreed, stating:

> "Absent some indication that the jury failed to follow some rule of law, considered some erroneous evidence, or an indication in the record that the verdict was the obvious result of passion or prejudice, we cannot upset that verdict. (*Rozner v. Chicago Transit Authority* (1989), 183 Ill. App. 3d 613, 539 N.E.2d 270.) [Plaintiff's] evidence indicated [plaintiff] suffered both a disability as a result of the accident and pain and suffering. Yet, [plaintiff] offered no evidence of her medical expenses. Conversely, defendants' evidence indicated that [plaintiff] was treated for similar pain and suffering prior to the accident in question. It is obvious that the jury concluded that [plaintiff] suffered a disability as a result of the accident for which they assessed damages at $35,000. It is also obvious that the jury concluded that [plaintiff] failed to prove that the pain and suffering she experienced or was certain to be experienced [*sic*] was caused by the September 25, 1984, accident. The evidence supports this conclusion of the jury, and we cannot conclude that the verdict is inconsistent, unsupported by the evidence or a result of passion or prejudice. Accordingly, we affirm the decision of the trial court."

Cases cited by the *Perry* court as authority for approving personal injury awards for economic damages only were *Griffin v. Rogers* (1988), 177 Ill. App. 3d 690, 532 N.E.2d 591 (court on review approved $365 and $110 awarded for medical expenses and wages, respectively, and $0 for pain and suffering), and *Meyers v. Louthan* (1983), 114 Ill. App. 3d 770, 449 N.E.2d 904 (reversing trial court's award of new trial based on jury verdict awarding plaintiff compensation for emergency room bills and nothing for pain and suffering).

In my opinion, the modern cases rejecting the defendant's position—*i.e.*, equating $0 noneconomic damages with "no injury"—are the better reasoned. Just as the courts in the aforecited cases found evidentiary support for the jury awards, I find ample support here.

Also, I take issue with my colleagues' bald assertion that the damages of these plaintiffs "were capable of being calculated." In my opinion, the jury properly determined they were not. The plaintiffs established defendant's misconduct in continuing to manufacture and place into the stream of commerce a product containing the single most toxic chemical known to man—this despite general corporate knowledge of the state-of-the-art methods for eliminating the compound. Defendant's misconduct was proved to the jury's satisfaction. The jury was entitled, however, to reject plaintiffs' evidence of specific damages and award only nominal damages for the injuries suffered.

Under these circumstances, it is most important to be mindful of the fact that the jury was not considering merely negligence, wherein the trial focuses on the harm resulting to the injured plaintiffs and where credible evidence relating to the degree of plaintiffs' injury determines the appropriate measure of compensatory damages. This is a wilful/wanton misconduct case, wherein the focus is on the defendant's misconduct. The reprehensibility of that misconduct and the need to deter it are primary factors in determining the appropriate level of punitive damages. By comparison, the nature and severity of plaintiffs' injuries may be difficult to prove, inexact, and only nominally compensable without being deemed on review insufficient to support a substantial award for punitive damages. In this case, plaintiffs' proof properly focused on defendant's misconduct. Obviously, greed was the overriding incentive—by short-cutting the production process, the profit margin was greater. By finding for plaintiffs, the jury found that the misconduct alleged had been proved, and such finding was eminently reasonable and based on the evidence.

In an analogous situation, a jury in Cook County found defendant asbestos manufacturer liable for compensatory and punitive damages on a wilful and wanton theory. (*Lipke v. Celotex Corp.* (1987), 153 Ill. App. 3d 498, 505 N.E.2d 1213.) In *Lipke*, the defendant had corporate knowledge for between 5 and 40 years that its asbestos products were dangerous. The corporate defendant was aware of substitutes for asbestos for some 15 years but did not use them because asbestos was cheaper. The corporation "failed to take any real measures to protect the public until 1970 [10 years before plaintiff last worked for defendant]." (153 Ill. App. 3d at 505.) Plaintiff developed squamous

cell cancer and sued his former employer. The jury found for the plaintiff and awarded compensatory and punitive damages. On review, the court affirmed the jury's verdict and succinctly stated the law of Illinois respecting the review of punitive damages for wilful and wanton misconduct:

> "The question for review, therefore, is whether the facts of the case warrant imposing punitive damages. (*Yearian v. Columbia National Bank* (1980), 86 Ill. App. 3d 508, 408 N.E.2d 63.) 'The question of wilful and wanton conduct is essentially whether the failure to exercise care is so gross that it shows a lack of regard for the safety of others.' (*Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 136, 253 N.E.2d 636, *aff'd* (1970), 46 Ill. 2d 288, 263 N.E.2d 103.) '*Ill-will is not a necessary element of a wanton act.* To constitute an act wanton, the party doing the act or failing to act must be conscious of his conduct, and, *though having no intent to injure*, must be conscious, from his knowledge of the surrounding circumstances and conditions, that his conduct will naturally and probably result in an injury.' *Streeter v. Humrichhouse* (1934), 357 Ill. 234, 238, 191 N.E.2d 684." (Emphasis added.) *Lipke*, 153 Ill. App. 3d at 505, 505 N.E.2d at 1218.

While it would appear that the plaintiff in *Lipke* established his right to compensatory damages by proving lung cancer some 10 years after his last exposure to asbestos in defendant's employ, I find no less compelling factual grounds in the present case for affirming the jury's award of punitive damages against this defendant. Even lacking any evidence of Monsanto's ill-will or intent, the facts in the record before us amply support the jury's conclusion of liability for wilful and wanton misconduct. Under the circumstances, I find no justification, legal, factual or based on public policy, to reject the jury's perception that even slight injury entitling the plaintiffs to nominal compensatory damages could be the basis for punishing the wrongdoer.

Much of plaintiffs' evidence of damages related to their fear of future harm or consequences from exposure to dioxin in their environment. In my opinion, this is a legitimate basis for recovery. (See *Petriello v. Kalman* (1990), 215 Conn. 377, 576 A.2d 474 (Connecticut Supreme Court held in obstetrical malpractice suit in which plaintiff was subjected to increased risk of future bowel obstruction that plaintiff could recover both for her present fear of future consequences and for the value of the increased risk of future harm); see also *Brown & Williamson Tobacco Corp. v. Jacobson* (7th Cir. 1987), 827 F.2d 1119 (relying on Illinois defamation law, court on review

awarded $1 million in "presumed" compensatory damages even though no specific pecuniary loss was proved and approved jury award of $2,050,000 in punitive damages against television network and news broadcaster); *In re Application of Busse* (1984), 124 Ill. App. 3d 433, 439, 464 N.E.2d 651, 656 (in context of action for fraud and deceit, court recited that "a presumption of at least nominal damages follows from proof of a legal wrong [citations], and a liability for nominal damages is sufficient to sustain a cause of action"); *Gertz v. Welch* (1974), 418 U.S. 323, 350, 41 L. Ed. 2d 789, 811, 94 S. Ct. 2997, 3012 (again, in defamation context, Court observes that jury verdict awarding compensatory damages may be sustained based on evidence of injury, "although there need be no evidence which assigns an actual dollar value to the injury").) But how does a jury calculate a monetary compensation for such injury? As I see it, the jury here found an injury in fact which was not susceptible of precise calculation; and, considering the law of Illinois as it appeared in the instructions they were given, the jury awarded a nominal $1 as compensation therefor. Justice Green, in his specially concurring opinion, implicitly acknowledges as much. And, as so aptly stated by my specially concurring colleague, quoting from Keeton & Prosser on Torts, it is precisely this type of case in which nominal damages should be permitted to support a punitive damage award. Neither *Loitz* nor *Haslip* says otherwise.

My learned colleague, nonetheless, backs off from the enlightened view and goes on to portend of dangers of punitive damages "running wild." Again, as with the main opinion, he has chosen the easy way out, dumping the entire jury verdict, without regard to the substantial factual basis for an award of punitive damages.

As indicated above, it is my opinion that a reviewing court's outright reversal without factual analysis is always ill-advised and frustrates the jurisprudential system we have pledged to uphold. In a situation analogous to this case, the district court in the *Jacobson* case reduced the jury's assessment of compensatory damages for defendant's defamation of the plaintiff cigarette manufacturer from $3 million to $1. In reinstating $1 million of the jury's verdict for "presumed" damages, the circuit court of appeals looked to the factual scenario in which the defamatory statements were made and concluded that $1 million was "sizeable but on the facts of this case it is not 'substantial' under Illinois law." (*Jacobson*, 827 F.2d at 1142.) The court acknowledged that its process in reaching the $1 million figure was "a very inexact and somewhat arbitrary process" but that such process was inherent in Illinois law of presumed damages. Philosophi-

cally I find no greater need to "presume" compensatory damages in the defamation context than to permit a nominal compensatory award for wilful and wanton misconduct potentially causing insidious health consequences of dioxin poisoning. As the evidence in this case demonstrated, the dangers of dioxin are real. Dioxins are deadly and their long-term effects may be physically debilitating to an as-yet-unknown degree. Certainly the presumed loss to one's reputation is no more worthy of this State's protection than a community's fear of cancer from exposure to dioxin.

Defendant has invited our consideration of the Supreme Court's most recent pronouncement concerning the proper review of punitive damages (*Pacific Mutual Life Insurance Co. v. Haslip* (1991), 499 U.S. ____, 113 L. Ed. 2d 1, 111 S. Ct. 1032), and I believe that the Court's opinion merits application here. In *Haslip*, plaintiff insureds brought an action in fraud against defendant life and health insurance company for its agent's misappropriation of premium payments made after plaintiffs' policy was cancelled without notice to the insureds. Mrs. Haslip incurred medical bills far beyond her ability to pay and learned she was uninsured. Her credit rating was ruined. After a trial by jury, a verdict for Mrs. Haslip was entered in the amount of $1,040,000, $840,000 of which represented punitive damages. The trial court, pursuant to Alabama law requiring post-verdict review of punitive damages awards, conducted a hearing "to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." (*Hammond v. City of Gadsden* (Ala. 1986), 493 So. 2d 1374, 1379.) The award was affirmed on review by the supreme court of Alabama and *certiorari* was granted by the Supreme Court. In approving the procedure adopted by Alabama, the Court observed that the review there given "makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." In particular, the Court sanctioned the following factors to be applied in the review of punitive awards:

"(a) whether there is a reasonable relationship between the punitive damages award and the *harm likely to result* from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of *reprehensibility* of the defendant's conduct, the *duration of that conduct*, the defendant's *awareness*, and *any concealment*, and the existence and frequency of similar past conduct; (c) the *profitability* to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the

'*financial position*' of the defendant; (e) all the *costs of litiga-tion*; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation." (Emphasis added.) (*Haslip*, 499 U.S. at ____, 113 L. Ed. 2d at 22, 111 S. Ct. at 1045, citing *Green Oil Co. v. Hornsby* (Ala. 1989), 539 So. 2d 218, 223-24; and *Central Alabama Electric Cooperative v. Tapley* (Ala. 1989), 546 So. 2d 371, 376-77.)

Notwithstanding the jury's finding of plaintiffs' entitlement to only nominal compensatory damages in this case, the ineluctable result of applying the foregoing factors is an approval of the $16.25 million punitive damages award.

In sum, I find no abuse of the trial court's discretion in denying defendant's motion for judgment notwithstanding the verdict in this case. I am satisfied that the jury's award in plaintiffs' favor was based on the evidence presented at trial, and I would affirm the trial court's ruling on the motion.

I further find no reversible error in the trial court's decision to reject defendant's corporate complicity jury instruction. I do not deny that the law of Illinois at the time this case was tried was as stated by the majority. But I do not find that any instruction error here would in itself require a new trial. In my opinion, the IPI *respondeat superior* instruction given could not have affected the jury's verdict on the wilful/wanton misconduct count. The testimony relative to defendant's knowledge established that the corporation had knowledge of the dioxins it was producing at the Krummrich plant and their toxicity, and that defendant could have prevented their formation since at least the mid-1950's. This knowledge was imputed to the corporation via "superior officers," including defendant's production supervisor, its chemical engineers, its plant managers, its director of research and development, its house counsel, its biohazards committee, and its director of medical and environmental health. Evidence of defendant's engineers', managers', supervisors', directors' and counsels' *deliberate corporate participation* in the production of toxic products despite awareness of state-of-the-art methods to prevent the toxicity and defendant's *ratification* of the misconduct by continuous production for some 20 to 30 years until 1980 (several years after the accident underlying this case) permeated the trial and overwhelmingly satisfied the corporate complicity rule of this State. Again, the cases cited by the main opinion are inapposite.

In *Pendowski v. Patent Scaffolding Co.* (1980), 89 Ill. App. 3d 484, 489, 411 N.E.2d 910, 914, the court found reversible error because the jury "could have based its verdict finding [defendant] liable for wilful and wanton conduct upon an act *not* ordered, participated in, or ratified by [defendant]." (Emphasis added.) It is clear to me that, but for the lack of evidence of corporate participation in the alleged wrongdoing in *Pendowski,* the court would not have found reversible error in the giving of the *respondeat superior* instruction. *Mattyasovszky* and *Tolle* likewise were decisions in which jury awards of punitive damages were reversed not for improper jury instructions, but for inadequate evidence of corporate liability. (See also *Haslip,* 499 U.S. ____, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (Court ruled in the context of the fraud suit that insurance agent's misconduct entitling plaintiffs to punitive damages against insurance company on *respondeat superior* theory did not deprive corporate defendant of substantive due process).) By contrast, the majority here finds reversible error without regard to evidence of corporate participation and ratification presented at trial.

Based on the vast amount of evidence of corporate knowledge and the corporation's unabated production of dioxins in its consumer products over an extended period of time, the jury in this case could not have reached a contrary verdict had defendant's corporate complicity instruction been substituted for the *respondeat superior* one given. Accordingly, I find no abuse of discretion in the trial court's decision to deny defendant's motion for a new trial on this basis.

Next, I must agree with my colleagues that the trial court's admission of evidence of prior dissimilar incidents at defendant's plants located throughout the world, etc., was prejudicial error. Prejudicial error occurred, for instance, when the trial court denied defendant's objections to statements made by the witnesses and counsel that defendant exposed babies and the elderly to dioxins in Lysol, that defendant had lied to the Canadian government in 1981 and to the E.P.A. in 1980 regarding the presence of dioxin in Santophen, that Agent Orange inflicted long-term illnesses on American soldiers in Viet Nam without warning, and that the Agent Orange case had been settled.

On the other hand, I find much of the testimony complained of relevant to plaintiffs' claim for punitive damages, *e.g.*, that defendant misled its own employees about chloracne, a skin condition resulting from dioxin exposure; that defendant produced chemicals used in the manufacture of other consumer products, such as Lysol and Weed-B-Gone, that in fact contained dioxins; and that defendant for seven

years daily dumped up to 40 pounds of dioxin from its Krummrich plant into the Mississippi River, thereby poisoning downstream food and water supplies. Even though these particular plaintiffs did not claim injury from these other chemicals, I believe that the testimony was relevant to the issue of defendant's knowledge on the wilful/wanton count that dioxin was a by-product of its chemical production, including OCP-crude, and supportive of the claim for punitive damages.

For purposes of the product liability count, I find no error in the admission of evidence of post-incident misconduct to the extent that such testimony may have been relevant to the issue of unreasonable dangerousness of OCP-crude. (*Bass v. Cincinnati, Inc.* (1989), 180 Ill. App. 3d 1076, 1081, 536 N.E.2d 831, 835.) However, inasmuch as the product liability claim was rejected by the jury and plaintiffs have not appealed, such evidence would not be appropriate on remand.

I agree with my colleagues' back-up position that this cause must be remanded for another trial. Although I do not find reversible error on any of the individual grounds treated in my colleagues' opinions, having thoroughly considered these and other arguments relative to issues that are not likely to arise on retrial, I am of the opinion that the cumulative effect, primarily of the evidentiary errors, entitles defendant to a new trial.

With respect to the Kemners' claim for damages to real estate, I cannot subscribe to the majority's reassessment of the evidence to arrive at the conclusion that the diminution of their property was not a result of dioxin contamination. In my opinion, from the fact that dioxin was in the OCP-crude, the further fact that the OCP-crude flowed across the Kemners' land and the further fact that the OCP-crude was found downstream from the Kemners' property, the jury could infer that dioxin necessarily contaminated all of the land that the OCP-crude touched. William Kemner's testimony of the devaluation of his property was unrebutted. Thus, rather than reversing outright the jury's verdict for the property owners, considering the cumulative effect of errors affecting claims for wilful and wanton misconduct, I would grant a new trial as to the Kemners' property damage claims as well.

I agree generally with the majority opinion's discussion of the trial court's ruling on plaintiffs' section 2—611 motions and its reversal of an award reimbursing St. Clair County for juror fees, expenses, and extraordinary costs. I also agree with the majority's rejection of defendant's *forum non conveniens* and Federal preemption positions.

I would remand the entire cause for a new trial.