**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JANICE F. JORDAN,
Plaintiff-Appellee,

v.                                                            No. 96-2189

SHAW INDUSTRIES, INCORPORATED,
Defendant-Appellant.

E. A. MYERS, JR.,
Plaintiff-Appellee,

v.                                                            No. 96-2190

SHAW INDUSTRIES, INCORPORATED,
Defendant-Appellant.

RICHARD A. JENSEN,
Plaintiff-Appellee,

v.                                                            No. 96-2191

SHAW INDUSTRIES, INCORPORATED,
Defendant-Appellant.

MICHAEL JACOBS,
Plaintiff-Appellee,

v.                                                            No. 96-2192

SHAW INDUSTRIES, INCORPORATED,
Defendant-Appellant.

JANICE F. JORDAN,
Plaintiff-Appellee,

v.                                              No. 96-2371

SHAW INDUSTRIES, INCORPORATED,
Defendant-Appellant.

RICHARD A. JENSEN,
Plaintiff-Appellant,

v.                                              No. 96-2373

SHAW INDUSTRIES, INCORPORATED,
Defendant-Appellee.

Appeals from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
N. Carlton Tilley, Jr., District Judge.
(CA-93-542-6, CA-93-543-6, CA-93-544-6, CA-93-545-6,
CA-93-542-6, CA-93-544-6)

Argued: October 2, 1997

Decided: November 26, 1997

Before LUTTIG and MOTZ, Circuit Judges, and MICHAEL,
Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Charles Daniel Barrett, EDWARDS, BALLARD,
CLARK, BARRETT & CARLSON, P.A., Winston-Salem, North

2

Carolina, for Appellant. Norwood Robinson, Carl Ray Granthan, Jr., ROBINSON & LAWING, L.L.P., Winston-Salem, North Carolina, for Appellees. **ON BRIEF:** Kenneth P. Carlson, Jr., Jonathan W. Yarbrough, EDWARDS, BALLARD, CLARK, BARRETT & CARLSON, P.A., Winston-Salem, North Carolina, for Appellant. H. Stephen Robinson, ROBINSON & LAWING, L.L.P., Winston-Salem, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

I. <u>CHRONOLOGY</u>

A. <u>Factual</u>

These consolidated age discrimination, sex discrimination and common law fraud actions arise out of the merger of two large, national carpet manufacturers and distributors. In 1992, Shaw Industries, Inc. ("Shaw") purchased Salem Carpet Mills, Inc. ("Salem"). Prior to the merger, the four plaintiffs were vice-presidents at Salem. E.A. Myers ("Myers"), Richard A. Jensen ("Jensen") and Michael Jacobs ("Jacobs") were divisional vice-presidents ("DVP's") and Janice F. Jordan ("Jordan") was vice-president of the outlet division.

The plaintiffs and Shaw's other employees first learned of the corporate merger proposal in February 1992 when the news was announced to all Salem employees. Shaw took control of much of Salem's business at this point although Salem's shareholders did not approve the merger until late May 1992. During this time, Kim Holm, Salem's executive vice-president, and Ernie Ferrell, Salem's senior vice-president, acted as liaisons between Shaw and Salem management. Ms. Holm and Mr. Ferrell repeated reassurances from Shaw

3

management that the plaintiffs and other Salem employees would retain their jobs after the merger.

At one point before the merger approval, Holm dissuaded Jacobs from pursuing an employment opportunity with a third party employer telling Jacobs that he "had a job at Shaw." Also during this time, Robert Shaw, Chief Executive Officer ("CEO") of Shaw, told Ms. Jordan that all Salem employees, except Salem's CEO, would have jobs at Shaw after the merger. Later, Mr. Jensen, Mr. Myers, and Mr. Jacobs attended a group meeting during which Robert Shaw welcomed them all to the Shaw company and explained that he thought that past decisions to fire employees after corporate mergers had been mistakes. The plaintiffs understood from these comments that they would have jobs with Shaw after the merger.[1]

Following the May 31, 1992 shareholder approval of the merger, meetings for the former Salem DVP's and Shaw regional vice-presidents ("RVP's") were held in Dalton, Georgia at Shaw's headquarters. Each plaintiff was given an itinerary for the week and told to plan to stay in Dalton for up to four days. Each plaintiff, however, was told to come first to Salem's office in Ringgold, Georgia on June 1 before going on to Dalton; no plaintiff was told of the reason for the side trip. Upon arriving in Ringgold, each plaintiff was fired by Randy Merritt, Shaw's Vice-President of Sales, and Elbert Shaw, Shaw's Director of Human Resources.

B. Procedural

On September 13, 1992, Ms. Jordan, Mr. Myers, Mr. Jensen, and Mr. Jacobs filed four separate complaints against Shaw Industries and Robert Shaw, individually. Each complaint alleged, inter alia, age discrimination in violation of the Age Discrimination and Employ-

_____

[1] As well, after the merger proposal was announced, plaintiffs Jensen, Jacobs, and Jordan traveled to Las Vegas, Nevada to attend a carpet manufacturers convention. During the convention, Vance Bell, Shaw's Vice-President of Marketing, invited Mr. Jacobs to attend meetings with Shaw's sales personnel. During the same convention, Robert Shaw, CEO of Shaw Industries, told Ms. Jordan that all Salem employees, save its CEO, would have jobs with Shaw after approval of the merger.

ment Act ("ADEA"), 29 U.S.C. § 621 et seq., common law fraud, and, in the case of Ms. Jordan, sex discrimination in violation of Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e et seq.**2**

The four cases were consolidated for a bifurcated trial on liability and damages held January 8, 1996 to February 9, 1996. The jury returned a verdict finding Shaw liable to all plaintiffs for age discrimination and fraud, and liable to Ms. Jordan for sex discrimination. As to damages, the jury found that Shaw had wilfully violated the ADEA and awarded back pay in the amounts of $219,661 to Ms. Jordan, $242,457 to Mr. Myers, $436,583 to Mr. Jensen, and $351,859 to Mr. Jacobs. On the fraud claims, the jury awarded compensatory damages in the amounts of $32,000 to Ms. Jordan, $12,000 to Mr. Myers, $50,750 to Mr. Jensen, and $2500 to Mr. Jacobs; the jury also awarded each plaintiff $1,222,250 in punitive damages. Finally, as to Ms. Jordan's Title VII claim, the jury awarded her $57,000 in compensatory damages and $344,000 in punitive damages.

In July 1996, the court awarded the plaintiffs liquidated damages under the ADEA in amounts equal to the jury's award of back pay. Plaintiffs' claims for ADEA front pay were denied and Ms. Jordan and Mr. Jacobs were ordered reinstated with Shaw. By Order and Memorandum Opinion, the court on August 13, 1996 denied, in part, Shaw's three post trial motions (1) for judgment as a matter of law, (2) to alter or amend the judgment, and (3) for a new trial. Shaw's instant appeal is from this Order.

By the same August 13, 1996 Order, the court also directed that the jury verdict on Ms. Jordan's fraud claim be set aside, judgment vacated, and the claim dismissed under Georgia law because of Ms. Jordan's status as an at-will employee without a written contract; that the jury's award of compensatory and punitive damages in Mr. Jensen's fraud claim be set aside; and that the total amount of Ms. Jordan's compensatory and punitive damages for her Title VII claim be

_____

**2** These three causes of action are those that survived a December 14, 1995 Order of the district court granting summary judgment for defendants, dismissing all other claims, and dismissing Robert Shaw as a defendant.

5

reduced to $300,000. Plaintiffs Jordan and Jensen filed their instant cross appeal from this Order.**3**

II. STANDARDS OF REVIEW

As to questions of law, which here include the district court's denial, in part, of Shaw's motion for judgment as a matter of law, review is de novo. Benesh v. Ampherol Corp. (In re Wildewood Litigation), 52 F.3d 499, 502 (4th Cir. 1995). The abuse of discretion standard governs the district court's denial of a motion for a new trial and its denial, in part, of a motion to alter or amend judgment. Bristol Steel & Iron Works v. Bethlehem Steel Corp., 41 F.3d 182, 186 (4th Cir. 1994); Collison v. Intern. Chemical Workers Union, 34 F.3d 233, 236 (4th Cir. 1994).

III. DISCUSSION

A. Choice of Law on the Fraud Claims

The Supreme Court of North Carolina consistently has held that the lex loci delicti doctrine applies to actions sounding in tort. Boudreau v. Baughman, 368 S.E.2d 849, 854 (N.C. 1988). Under this doctrine, the tort is deemed to have taken place, for choice of law purposes, in the jurisdiction in which the last event necessary to impose liability occurs. Id. The lex loci delicti rule applies in fraud actions, as in most tort actions. Food Lion, Inc. v. Capital Cities/ABC, Inc., 951 F.Supp. 1217, 1219 (M.D.N.C. 1996) ("It should be noted that resolution of the fraud . . . claim[ ] is governed by the law of the `forum in which the acts giving rise to the claim occurred.'"), citing and quoting Tatham v. Hoke, 469 F.Supp. 914, 916 (W.D.N.C. 1979), aff'd, 622 F.2d 587 (4th Cir. 1980), and Charnock v. Taylor , 26 S.E.2d 911 (N.C. 1943).

In the case below, however, the district court instead applied the "significant relationship" test to plaintiffs' State law fraud actions and held that the laws of New York, North Carolina, and Illinois governed

_____

**3** Plaintiffs Myers and Jacobs filed a motion to dismiss their appeals which this court granted by Order of November 8, 1996.

the fraud actions of Mr. Jacobs, Mr. Myers and Mr. Jensen, respectively, as "the place of the wrong." Charnock, 26 S.E.2d at 913. Although the district judge erred in applying the significant relationship test, the error was harmless because even under the lex loci rule, those same States' laws would govern the fraud actions.

Again, under the lex loci rule, the place of the wrong is the locale in which the last act by a defendant occurs which makes him liable in tort. Brendle v. General Tire and Rubber Company, 408 F.2d 116, 117 n.3 (4th Cir. 1969) ("The traditional lex loci rule is that tort actions are governed by the law of the place of the wrong, which is `the [S]tate where the last event necessary to make an actor liable for an alleged tort takes place.'"), quoting Restatement of Conflict of Laws § 377 (1934).

"When a person sustains loss by fraud, the place of the wrong is where the loss is sustained, not where fraudulent representations are made." Id. at n.4. The elements of fraud are: (1) a false representation of a past or existing fact; (2) made with knowledge that the representation was false when made or made recklessly without any knowledge of its truth; (3) with the intent that it be relied on by the plaintiff; and (4) which caused injury to the plaintiff through his reasonable reliance on the false representation. Soules v. General Motors Corp., 402 N.E.2d 599, 601 (Ill. 1980); New York University v. Continental Ins. Co., 662 N.E.2d 763, 769 (N.Y. 1995); Claggett v. Wake Forest University, 486 S.E.2d 443, 447 (N.C. 1997).

Here, the pivotal event relevant to the "reasonable reliance" fraud element occurred not in Georgia when the plaintiffs were fired, but earlier in the States of their respective workplaces when they received Shaw's direct or indirect reassurances that they would keep their jobs. The "last act" necessary for a fraud claim is the reasonable reliance on the false representation which causes the injury. It is not the firing itself which, instead, is the last act necessary for both the Title VII and ADEA discriminatory termination claims. To invoke the termination as the last act would be to conflate plaintiffs' fraud actions into their employment discrimination actions. Thus, the district court did not err in choosing, as the law governing the fraud claims, the law of the State in which each plaintiff respectively was headquartered and received defendant's various reassurances of continued employment.

7

B. <u>Ms. Jordan's Fraud Claim</u>

The law of the State of Georgia applied to Ms. Jordan's fraud count. Because Ms. Jordan was an at-will employee without a written contract, Shaw was entitled, under Georgia law, to fire her for good reason, bad reason, or no reason. Thus, the district court correctly granted Shaw judgment as a matter of law on Ms. Jordan's fraud claim, set aside the jury's verdict, vacated the judgment, and dismissed the claim. <u>See Wheeling v. Ring Radio Co.</u> , 444 S.E.2d 144, 146 (Ga. 1994).

C. <u>Other Plaintiffs' Fraud Claims</u>

Shaw argues that, like Ms. Jordan, Mr. Jacobs was an at-will employee under New York law and that such an employee cannot state a claim for fraud based on an alleged promise of future employment. New York courts, however, have held that at-will employment status does not bar a fraud claim, but does bar a breach of contract claim. <u>See Navaretta v. Group Health Inc.</u>, 595 N.Y.S.2d 839, 840 (N.Y. App. Div. 1993); <u>Stewart v. Jackson & Nash</u> , 976 F.2d 86, 88 (2d Cir. 1992). Similarly, in North Carolina and Illinois, an at-will employee may bring an action alleging a fraudulent promise of future or continued employment. <u>See Fortsmann v. Culp</u> , 648 F.Supp. 1379, 1383 (M.D.N.C. 1986) (holding that employee's at-will status defeats contract claim but not fraud claim); <u>Johnson v. George J. Ball Inc.</u>, 617 N.E.2d 1355, 1362 (Ill. Ct. App. 1993).

Accordingly, the district court did not err in denying Shaw's motion for judgment as a matter of law as to Messrs. Myers, Jensen, and Jacobs. Because the jury's finding was supported by adequate evidence that Shaw made actionable misrepresentations to these plaintiffs and because that evidence must be interpreted in the light most favorable to the plaintiffs in a motion to set aside the judgment, the district court, similarly, did not err in refusing to grant the motion.

D. <u>Punitive Damages</u>

1. <u>New York Law and the Public Wrong Requirement</u>

Under New York law, "[p]unitive damages may only be recovered in a fraud action where the fraud is aimed at the public generally, is

gross, and involves high moral culpability." Kelly v. Defoe Corp., 636 N.Y.S.2d 123, 124 (N.Y.App.Div. 1996), citing Walker v. Sheldon, 179 N.E.2d 497 (N.Y. 1961). In Walker, the Court of Appeals of New York imposed the "public wrong" requirement"as a limitation on the availability of punitive damages where a cause of action in fraud was stated. . . ." Rocanova v. Equitable Life Assurance Society of the United States, 634 N.E.2d 940, 945 (N.Y. 1994) (a breach of contract claim that restates the general rule against the availability of punitive damages). Mr. Jacobs presented no evidence below that the misrepresentations by Shaw were aimed at anyone other than the plaintiff employees of Salem; certainly no fraudulent statements were made to the public at large.

Shaw, however, never objected to the district court's jury instructions which lacked any mention of the public harm requirement for punitive damages. Indeed, Shaw never requested that such an instruction be given. Because Shaw did not preserve the point for appeal, this court will leave undisturbed the district court's jury instructions as to punitive damages under New York law.

2. Mr. Jensen's Punitive Damages Award

Illinois law does not recognize an independent cause of action for punitive damages. Kemner v. Mansanto Co., 576 N.E.2d 1146, 1153 (Ill.Ct.App. 1991) (citation omitted). Punitive damages, therefore, may be awarded only to a fraud plaintiff who can prove compensatory damages; a plaintiff who can establish but nominal damages is not entitled to punitive damages. Id. at 1153-54.

Because Mr. Jensen failed to present sufficient evidence of compensatory damages,[4] the district court did not err in setting aside the jury's award of both compensatory and punitive damages.

_____

[4] While Mr. Jensen did prove the elements of his fraud claim below and, therefore, ordinarily would be entitled to an award of nominal damages, at least, Mr. Jensen never sought a jury instruction respecting nominal damages. Even if Mr. Jensen had sought such an instruction and even if the jury had awarded him nominal damages, however, the district correctly concluded that the jury award of punitive damages must be set

9

3. Punitive Damages and Amendment XIV

In the trial below, the jury awarded the plaintiffs punitive damages on their fraud counts. The ratio of punitive damages to compensatory damages ranged from 101:1 in the case of Mr. Myers (compensatory damages of $12,000 and punitive damages of $1,222,250) to 488:1 in the case of Mr. Jacobs (compensatory damages of $2500 and punitive damages of $1,222,250).

In BMW of North America v. Gore, ___ U.S. ___, 116 S.Ct. 1589 (1996), the United States Supreme Court most recently addressed the issue of the potential excessiveness of punitive damages awards. The court outlined a three-pronged test to assess whether an award of punitive damages is so disproportionately greater than an award of compensatory damages as to violate the Due Process Clause of Amendment XIV to the United States Constitution. The factors to be considered are: (1) the degree of reprehensibility of the defendant's conduct;[5] (2) the ratio of punitive damages to the actual harm inflicted on the plaintiff; and (3) a comparison of the punitive damages award and the civil and criminal penalties that could be imposed for comparable conduct. BMW, 116 S.Ct. at 1599-1603. The court held that an award of $2 million in punitive damages when an automobile distributor merely had failed to disclose to a car purchaser that his car had been repainted prior to the purchase was "grossly excessive" and violated the Due Process Clause. Id. at 1598. The court reasoned that punitive damages are especially suspect when the compensated harm is only "economic harm," as in the case of the repainted car.

The court below found that Shaw's conduct in this case "involves

_____

aside because of the plaintiff's failure to prove compensatory damages. As the district court found, Mr. Jensen's injuries owed not to his reliance on Shaw's fraudulent misrepresentations but to his termination from the company. As an at-will employee, Mr. Jensen had to show a causational relationship between the fraud, not the termination, and any consequent damages.

[5] "Perhaps the most important indicium of the reasonableness of a punitive damages award" is the degree of reprehensibility of defendant's conduct. BMW, 116 S.Ct. 1599.

10

a greater level of reprehensibility" than was the case in <u>BMW</u>. Indeed, the district court concluded that the harm inflicted was more than purely economic. Although the ratios of punitive to compensatory damages here approach the 500:1 ratio that "`rais[ed] a suspicious judicial eyebrow'" in <u>BMW</u>, 116 S.Ct. at 1602, <u>citing</u> and <u>quoting</u> <u>TXO Production Corp. v. Alliance Resources Corp.</u>, 509 U.S. 443, 482 (1993) (O'Connor, J. dissenting), far more disparate punitive damages award ratios have been countenanced even in the wake of <u>BMW</u>. <u>See Lee v. Edwards</u>, 101 F.3d 805 (2nd Cir. 1996) (punitive to compensatory ratio of 75,000:1 allowed in 42 U.S.C. § 1983 and common law assault case).**6**

The jury's award of punitive damages does not contravene the Fourteenth Amendment under the governing <u>BMW</u> analysis. The jury, after weighing all the evidence and judging the reprehensibility of Shaw's conduct, imposed punitive damages in the amount it deemed justified. Considering the reprehensibility of the conduct at issue, the ratio of the punitive damages to actual harm, and the civil and criminal penalties**7** that could be imposed for comparable conduct, the punitive damages award cannot be said to have denied Shaw the Due Process of law.

E. <u>All Plaintiffs' ADEA Age Discrimination Claims and</u>
          <u>Ms. Jordan's Title VII Sex Discrimination Claim</u>

1. <u>The Governing Law</u>

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual . . . because of such individual's age. 29 U.S.C. § 623. The age-based protections

_____

**6** Indeed, the Supreme Court clarifies in <u>BMW</u> that it has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. . . . A higher ratio[of punitive damages to compensatory damages] may . . . be justified in cases in which the injury is hard to detect or the monetary value of non-economic harm might have been difficult to determine." 116 S.Ct. at 1602.
**7** <u>See, e.g.</u>, N.Y. Penal Law§ 70.15 (individual subject to imprisonment for criminal fraud); N.C. Gen. Stat. § 15A-1340.17 (same).

11

of the ADEA are "limited to individuals who are at least 40 years of age." Id. at § 631.

Title VII establishes that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

The same proof scheme applies both to claims of age and sex discrimination in cases of alleged employment discrimination. McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973) (establishing the general Title VII discrimination proof scheme in race discrimination context); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 n.6 (1980) (applying the McDonnell-Douglas framework to sex discrimination claims); Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 238 (4th Cir. 1982) (adopting the McDonnell-Douglas framework for use in ADEA cases). To establish a prima facie case of either type of discrimination, a plaintiff must show that (1) he or she was a member of a protected age or sex group; (2) he or she was discharged; (3) at the time of his discharge, he or she was meeting his employer's legitimate expectations; and (4) he or she was replaced by a substantially younger person of comparable or lesser qualifications (in the ADEA context) or she was replaced by a male of comparable or lesser qualifications (in the sex discrimination context). See McDonnell-Douglas, 411 U.S. at 802; Lovelace, 681 F.2d at 238; Fink v. Western Electric Co., 708 F.2d 909, 915 (4th Cir. 1983).

Under the McDonell-Douglas framework, an employment discrimination plaintiff has the initial burden of production. Mitchell v. Data General Corp., 12 F.3d 1310, 1315 (4th Cir. 1993). If such a plaintiff brings forth indirect evidence that establishes a prima facie case of age or sex discrimination, a presumption in favor of the existence of the unlawful discrimination arises and the burden of production shifts to the defendant-employer who then must articulate a legitimate, non-discriminatory reason for the adverse employment decision "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993) (emphasis

12

in original). Assuming that the employer demonstrates such a reason, the burden of production then shifts back to the plaintiff to show that the employer's reason was merely pretextual. Id.  If the plaintiff fails to produce evidence showing both that the defendant's proffered reason was pretextual and that the evidence creates a reasonable inference that age or sex was actually the determinative factor in the adverse employment decision, the discrimination claim must fail. Id. Notwithstanding the shifting burden of production, at all times the plaintiff retains the ultimate burden of persuasion. Id.

2. The Law Applied

In its motion for judgment as a matter of law, Shaw asserted that the Salem vice-presidents were "downsized" after Shaw, the acquiring company in the corporate merger, simply chose to retain its own employees while eliminating duplicative middle management positions held by former competitors. This decision, Shaw argued, constituted a legitimate, non-discriminatory reason for the terminations under the McDonnell-Douglas standard.

Shaw's argument, however, in focusing on the second step of the McDonnell-Douglas test, presupposes that the plaintiffs met their initial burden of producing evidence of prima facie  age and sex discrimination. This presupposition is inconsistent with Shaw's present contention that each plaintiff below failed to make out prima facie cases of age or sex discrimination under McDonnell-Douglas. As a matter of logic, the burden of production never would have shifted to Shaw to articulate a legitimate non-discriminatory justification for the plaintiffs' firings had the former Salem employees not met their respective initial burdens.[8]

At trial, the plaintiffs adduced evidence of prima facie age and sex discrimination. Shaw then rebutted the presumption of discriminatory

_____

[8] With respect to the plaintiffs' ADEA claims, Shaw's answers to the plaintiffs' interrogatories admitted that Messrs. Myers, Jacobs and Jensen and Ms. Jordan, all over the age of forty, were replaced by persons all under the age of forty. With respect to Ms. Jordan's Title VII sex discrimination claim, she presented sufficient evidence that she was replaced by a man of comparable or less qualifications.

13

motive with evidence that corporate downsizing accounted for the firings and constituted a legitimate non-discriminatory justification. The jury, as the factfinder, however, ultimately concluded that Shaw's proffered legitimate reason was pretextual and that discriminatory considerations based on age and sex actually accounted for the plaintiffs losing their jobs.

In fact, the jury heard varying and, at times, inconsistent testimony from Shaw officials concerning their reason for firing the plaintiffs. For instance, witnesses of Shaw variously testified that the ADEA plaintiffs either (1) had been fired, (2) had not been offered positions after the merger, (3) had never been Shaw employees, or (4) had resigned of their own accord. As to Ms. Jordan, the Title VII plaintiff, Shaw witnesses variously testified either (1) that the plaintiff was unqualified for the position of regional sales manager because she had never been a sales manager, or (2) that Jordan's experience as a sales manager was well known to Shaw witnesses. Moreover, Shaw witnesses offered conflicting testimony as to whether the company initially recommended that Ms. Jordan be retained or not with such affirmative testimony militating against Shaw's contention that Ms. Jordan was merely part of a workplace "tier" eliminated without regard to the sexes of its members. As the district court reasoned below, "`[f]rom such discrepancies a reasonable juror could infer that the explanations given by [Shaw Industries] at trial were pretextual, developed over time to counter the evidence suggesting . . . discrimination. . . .'" Jordan, et al. v. Shaw Industries, Inc., Mem. Op. at 26 (August 13, 1996), citing and quoting E.E.O.C. v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994).

In short, the parties presented ample conflicting evidence to the jury for resolution of the ultimate question in discrimination cases-- whether a discriminatory motive or a legitimate non-discriminatory reason accounted for the adverse employment decision at issue. Because the witness testimony during the trial below was conflicting and determinations of credibility are particularly within the prerogative of the finder of fact, this court shall not disturb the conclusions of the jury. "Determination of [discriminatory] motive is ordinarily a function within the purview of the fact finder because so much depends on an assessment of the credibility of the witnesses." Herold v. Hajoca Corp., 864 F.2d 317 (4th Cir. 1988). The district court did

14

not err in denying Shaw's motion to set aside the jury's finding of discriminatory motive on Shaw's part because the evidence did not clearly compel rejection of that finding.[9]

3. <u>Ms. Jordan's Title VII Compensatory and Punitive Damages</u>

Title 42, United States Code, Section 1981A, amended to Title VII by the Civil Rights Act of 1991, provides for compensatory and punitive damages in cases of intentional discrimination in employment. Those damages, however, are limited by 42 U.S.C.§ 1981A(b)(3) in that "[t]he sum of the amount of compensatory damages awarded under this section . . . and the amount of punitive damages awarded under this section, shall not exceed . . . in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000."

Accordingly, the district court did not err by reducing Ms. Jordan's award of compensatory and punitive damages for her Title VII claim to the statutory cap of $300,000 from the jury's award of $57,000 in compensatory damages and $344,000 in punitive damages.

IV. <u>CONCLUSION</u>

For the reasons stated herein, we hold that the district court did not err by denying and granting, in part, defendant Shaw's motion for judgment as a matter of law, by denying and granting, in part, Shaw's motion to alter or amend judgment, and by denying Shaw's motion for a new trial. We further hold that the district court did not err by setting aside the jury verdict on Ms. Jordan's fraud count, by setting aside the jury's award of compensatory and punitive damages in Mr. Jensen's fraud claim, and by reducing Ms. Jordan's compensatory and punitive damages in her Title VII claim to the applicable statutory cap. It is so ordered.

<u>AFFIRMED</u>

---

[9] Nor did the district court judge abuse his discretion by denying Shaw's motion for a new trial. Shaw failed to meet its burden of showing harmful error resulting from the court's decision to admit as evidence statements of Salem vice-presidents Holm and Ferrell that they acted as Shaw's agents when they provided the plaintiffs with reassurances that they would be given jobs with Shaw after the merger.

15